PEOPLE *v* DUFFIELD

OPINION OF THE COURT

1. HOMICIDE—MANSLAUGHTER—JURISDICTION—STATUTES.
    There is no Michigan statute giving a Michigan court jurisdiction over the subject matter of a manslaughter prosecution when the deceased was beaten in Michigan and died in another state.

REFERENCES FOR POINTS IN HEADNOTES
[1, 3] 40 Am Jur 2d, Homicide § 197 *et seq.*
[2] 40 Am Jur 2d, Homicide § 201.
[4] 40 Am Jur 2d, Homicide § 199.
[5] 40 Am Jur 2d, Homicide § 200.
[6] 40 Am Jur 2d, Homicide §§ 69, 295.
[7, 8] 29 Am Jur 2d, Evidence § 18.
[9] 29 Am Jur 2d, Evidence § 691.
[10] 29 Am Jur 2d, Evidence § 607.
[11] 40 Am Jur 2d, Homicide § 69.

2. HOMICIDE—JURISDICTION—PLACE OF DEATH—STATUTES.

>   Statute providing that if any mortal wound or other violence or injury be inflicted or poison administered on the high seas or in any other navigable waters or on land either within or without the limits of Michigan by means of which death ensues in any county in Michigan, the offense may be prosecuted in the county where death ensues by its plain language is only applicable to a prosecution in Michigan courts when the death occurs in Michigan regardless of where the fatal agency was administered (MCLA 762.6).

3. HOMICIDE — JURISDICTION — COUNTIES — DEATH OUTSIDE STATE — STATUTES — LEGISLATIVE INTENT — LEGISLATIVE POWER.

>   Statute providing that if any mortal wound be given or other violence or injury be inflicted or any poison be administered in one county by means of which death ensues in another county, the offense may be prosecuted in either county is not applicable to a manslaughter prosecution when the deceased was beaten in a Michigan county and died in another state because the reference to "county" refers only to Michigan counties and it is evident that the legislature neither intended nor has the power to confer jurisdiction on courts of another state (MCLA 762.5).

4. COMMON LAW—CONSTITUTIONAL LAW—STATUTES.

>   The common law, by constitutional provision, is recognized as a part of Michigan jurisprudence but it is the English common law unaffected by statute because in 1810 an act was passed putting an end to the effectiveness in Michigan of all the written law of England, France, Canada, and the Northwest and Indiana Territories (Const 1963, art 3, § 7; 1 Territorial Laws, Act of September 16, 1810, p 900).

5. HOMICIDE—MURDER—MANSLAUGHTER—DEATH OUTSIDE STATE—JURISDICTION—COMMON LAW.

>   Under the common law as adopted in Michigan and continuing in force, jurisdiction to prosecute for murder or manslaughter lies in the place where the blow was given when the victim dies outside the State of Michigan therefore, the circuit court of a county in Michigan had jurisdiction to try a case where the deceased was beaten in that county and died in another state.

6. HOMICIDE—MANSLAUGHTER—PLEA OF GUILTY—STATUTES.

>   On a plea of guilty to manslaughter what defendant remembered regarding the offense was sufficient to establish a crime and his

participation in it and the judge complied with the statute which enjoins the judge before pronouncing judgment or sentence upon plea of guilty to become satisfied after such investigation as he deems necessary for that purpose that the plea was made freely, with full knowledge of the nature of the accusation, and without undue influence where defendant stated he did not know exactly what happened, he was drinking, but then responded to questions by the judge that he knew he was there, he got in a fight with the victim, he had the victim on the floor, he was hitting him with his fists, and he did not know exactly where he hit the victim but did not think he used any weapon (MCLA 768.35).

7. CRIMINAL LAW—PLEA OF GUILTY—TRUTH OF PLEA—STATUTES—ARBITRARY ACT—CAPRICIOUS ACT.

Statutory requirement in regard to the acceptance of a plea of guilty that it shall be the duty of the judge to vacate the plea "whenever said judge shall have reason to doubt the truth of such plea of guilty" is an objective standard; no judicial act can lawfully be arbitrary or capricious (MCLA 768.35).

8. CRIMINAL LAW—PLEA OF GUILTY—APPEAL AND ERROR—STATUTES.

On appeal it cannot be said that a judge's action was not within the statute concerning acceptance of pleas of guilty, although any judge always has the option to refuse any plea of guilty, where the judge established a record on which he made his judgment and went further and stated the reasons on which he acted; the record indicated that the defendant did not claim to be innocent but rather sought to exculpate himself on the grounds of drunkenness (MCLA 768.35).

CONCURRING OPINION

BLACK, J.

9. HOMICIDE—MANSLAUGHTER—PLEA OF GUILTY—ACCEPTANCE OF PLEA—DISCRETION.

*Trial judge did not abuse his discretion in accepting a plea of guilty of manslaughter and there was no miscarriage of justice where defendant, represented by counsel, admitted that he got into a fight with the victim, that he hit the victim with his fist or something of this kind, and that he remembers he had the victim down on the floor and was hitting him with his fists.*

OPINION OF THE COURT

OPINION DISSENTING IN PART

T. G. KAVANAGH, J.

See Headnote 5.

10. CRIMINAL LAW—PLEA OF GUILTY—ACCEPTANCE OF PLEA.

*When a person cannot recall his actions constituting the commission of the offense with which he is charged, he cannot plead guilty, for there is no basis for the judgment of his own guilt; there should be no question of a guilty plea; the tenor of the statute is that* doubts *should be resolved against taking the plea.*

11. CRIMINAL LAW—PLEA OF GUILTY—INTOXICATION—REJECTION OF PLEA.

*The court should have rejected a plea of guilty when defendant told the court he was so drunk he did not remember what he did even though the defendant's intoxication would be no defense at a trial.*

Appeal from Court of Appeals, Division 3, Fitzgerald, P. J., and R. B. Burns and Bronson, JJ., affirming Cass, David Anderson, Jr., J.   Submitted June 24, 1971.   (No. 31 June Term 1971, Docket No. 52,702–1/2.)   Decided May 4, 1972.

20 Mich App 473 affirmed.

Ronald Duffield was convicted, on his plea of guilty, of manslaughter.   Defendant appealed to the Court of Appeals.   Affirmed.   Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Herman A. Saitz,* Prosecuting Attorney, for the people.

*Larry R. Farmer,* Assistant State Appellate Defender, for defendant on appeal.

WILLIAMS, J.   There are two issues in this case.

I. Whether under common law or statute the Circuit Court of Cass County has jurisdiction over the

subject matter of a manslaughter prosecution when the deceased was beaten in his home in Cass County, Michigan, and died in a hospital in South Bend, Indiana?

II. Whether the trial judge lawfully accepted defendant's plea of guilty when the defendant alleged he could not remember some of the details of the crime?

The deceased, John Henry Frazier, was beaten in his home in Cass County, Michigan, and was taken to Memorial Hospital in South Bend, Indiana, where he died a few days later. Defendant was charged with manslaughter (MCLA 750.321; MSA 28.553) and was represented by assigned counsel at his arraignment. At the arraignment, after the trial judge directly addressed the defendant explaining to him the offense with which he was charged and his right to a trial, defendant Duffield expressed his desire to plead guilty. He testified first that at the time of the assault he was intoxicated and did not know what had happened. In response to questioning by both Judge Anderson and the prosecutor, however, defendant testified that he did remember hitting the deceased with his fists while the deceased was on the floor and in response to further questions testified to essential facts. In response to final questions from the trial court the defendant answered that he had no doubt that he was guilty as charged and the court then accepted his plea of guilty. Defendant was convicted of manslaughter on his plea of guilty on May 25, 1967, and sentenced to 8 to 15 years in prison.

On January 26, 1968, at defendant's request, appellant counsel was appointed for him and on July 25 an order for leave to withdraw defendant's plea was filed. When defendant was examined concerning the

motion to withdraw his plea he denied any knowledge of the beating of the deceased. The trial judge, after determining that defendant's intoxication was voluntary, held that the defendant was well aware of his guilt, and that no miscarriage of justice had resulted from acceptance of the guilty plea. In his motion for withdrawal of the guilty plea defendant also challenged the jurisdiction of the Cass County Circuit Court on the ground that since deceased actually died in Indiana the crime of manslaughter could not occur in Michigan under either common law or Michigan statutory law. In denying the motion the trial judge held that MCLA 762.5, which grants jurisdiction to either the county of the blow or the county of the death, was applicable to the situation where blows occurred within the state but death occurred without. The Court of Appeals affirmed holding that the common law rule permitting jurisdiction in either the county of the blow or the county of the death was embodied in MCLA 762.5; MSA 28.848. *People* v *Duffield,* 20 Mich App 473 (1969).

## ISSUE ONE—JURISDICTION

In his brief and oral argument counsel for defendant ably contends that the Michigan circuit court was without jurisdiction either under statute or common law. He argues first that MCLA 762.5[1] is purely a venue statute concerning only those cases where both the assault and death occur within Michigan; and that MCLA 762.6[2] is the only exterritorial jurisdictional statute and covers only those cases where death ensues within the state. Second, he argues that under the common law there is no jurisdiction to try a defendant for an assault where the resulting death occurs without the territorial jurisdiction.

---

[1] Text *infra* p 307.
[2] Text *infra* pp 307–308.

We agree there is no Michigan statute giving jurisdiction in this situation (I *infra*). However, we hold there is common law jurisdiction (II *infra*).

## I. — *No Statutory Jurisdiction*

MCLA 762.6 is as follows:

"If any such mortal wound shall be given, or other violence or injury shall be inflicted or poison administered on the high seas, or in any other navigable waters, or on land, either within or without the limits of this state, by means whereof death shall ensue in any county thereof, such offense may be prosecuted and punished in the county where such death shall have ensued." MCLA 762.6; MSA 28.849; 1927 PA 175, c. II, § 6.

The question here is whether by virtue of this statute the Michigan courts have jurisdiction to hear a homicide case where it is undisputed that the death occurred in Indiana. As appellant correctly points out, by the plain language of the statute it is only applicable to a prosecution in Michigan courts when the death occurs in Michigan regardless of where the fatal agency was administered. This was recognized by the Court of Appeals below, 20 Mich App 473, 477 (1969), and we so hold.

The only relevance of this statute to these proceedings is that *People* v *Tyler,* 7 Mich 161 (1859), and *Tyler* v *People,* 8 Mich 320 (1860), are relied upon by both parties and these cases do involve a construction of this statute in relation to the common law. These cases are discussed *infra*.

MCLA 762.5 reads as follows:

"If any mortal wound shall be given or other violence or injury shall be inflicted, or any poison shall be administered in one county by means whereof death shall ensue in another county, the offense

may be prosecuted and punished in either county."
MCLA 762.5; MSA 28.848; 1927 PA 175, c. II, § 5.

Appellant claims that the Court of Appeals erroneously construed this statute as applicable to the case where death ensues outside the territorial jurisdiction of Michigan. The Court of Appeals noted that the statute was not specifically addressed to this issue and treated the statute as embodying the common law rule that jurisdiction lies in either the county of the blow or the county of the death. 20 Mich App 473, 476–477.

Appellant contends that MCLA 762.5 is a *venue* statute and cannot confer jurisdiction on the courts of Michigan where death ensued without the state. In support of his argument that the statute merely provides for the place of trial when both the assault and death occur within Michigan, defendant correctly points out that the reference to "county" must refer only to Michigan counties. If we were to construe the statute as applicable to this case then it could mean that the offense may be prosecuted in either Cass County or in the county in Indiana where the death occurred, and it is evident that the legislature neither intended nor has the power to confer jurisdiction on Indiana courts. MCLA 762.5 is not applicable in this case.

We find no statute giving jurisdiction in this case.

## II. — *Common Law Jurisdiction*

### 1 — *What Constitutes the Common Law of Michigan?*

Since there is no jurisdiction by statute, if the defendant was properly convicted it must be because the surviving common law rule is that in cases involving different jurisdictions the homicide occurs where the homicidal blow is struck.

Although we have recognized the common law as part of our jurisprudence, Const 1963, art 3, § 7, it is the English common law unaffected by statute. English statutes of general operation were in force in the territory at one time, but in 1810 an act was passed putting an end to the effectiveness in Michigan of all the written law of England, France, Canada, and the Northwest and Indiana Territories. 1 Territorial Laws, Act of September 16, 1810, p 900; *In the Matter of Lamphere*, 61 Mich 105, 108 (1886); *Methodist Church of Newark* v *Clark*, 41 Mich 730, 741 (1879); *Trask* v *Green*, 9 Mich 357, 365 (1861); 1 Blume, *Transactions of the Supreme Court of the Territory of Michigan*, 1805–1814, pp xxxi–xl; and see *In the Matter of Jackson*, 15 Mich 416, 438 (1867); *Plaza Investment Co* v *Abel*, 8 Mich App 19, 25 (1967).[3]

This case must therefore be governed exclusively upon common law prior to the enactment of the statutes of 2 and 3 Edward VI, c. 24 (1548)[4] and 2 George

---

[3] *People* v *Den Uyl*, 320 Mich 477, 486 (1948) and *In re Sanderson*, 289 Mich 165, 174 (1939) have been erroneously construed as holding that English statutes are part of our common law in 5 MLP, Common Law, § 1. *Den Uyl, supra,* held merely that the habeas corpus act of 1679 (31 Car II, c. 2) was in affirmance of the common law and the principles of that act became part of our common law. The statement in 5 MLP, Common Law, § 1 " * * * The common law of some states, including Michigan, consists in part of certain English statutes enacted prior to a certain date * * * " is wrong as far as its reference to Michigan is concerned. There is dicta in *Sanderson, supra,* implying that the common law as modified by English statutes of general operation is part of our common law. In so far as the case implies that those English statutes were part of our common law during all of the territorial period it is in error, but that in no way affects the result in that case which was based upon Michigan statute.

[4] After reciting the reason for the statute as being the jurisdictional doubts (referred to by Coke, Hale and others), the statute enacts that:

"[W]here any person shall be feloniously stricken or poisoned in one county, and die of the same stroke or poisoning in another county, an indictment thereof found by jurors of the county where the death shall happen, * * * shall be as good and effectual in law as if the stroke or poisoning had been committed and done

II, c. 21 (1729)[5] (reenacted 9 George IV, c. 31, § 8 [1828]) which related to striking or poisoning in one place and death ensuing in another.

### 2 — *Michigan Cases Construing Common Law Alternate Jurisdiction*

There are no cases in Michigan which directly construe the common law on this point.

Obiter dicta occurs in three cases. In each case the language is that of Justice CAMPBELL. In one case, he stated:

"Until provided for by statute, death in one county from an attack in another did not make murder in either county." *Chapman* v *People*, 39 Mich 357, 360 (1878).[6]

In another case, he stated:

"Where death does not immediately follow the mortal blow, and happens in another jurisdiction within the realm, the place of death was generally, under the views taken by the common law authorities, the proper place of jurisdiction; * * * * "

---

in the same county where the party shall die, or where such indictment shall be so found." 2 & 3 Edward VI, c. 24, § 2.

[5] 2 George II, c. 21 enacted that:

"[W]here any person be feloniously stricken or poisoned at any place (in England), and shall die of the same stroke or poisoning upon the sea; or at any place out of (England)," or *vice-versa*, an indictment could be had where "such death, stroke, or poisoning shall happen respectively * * * ."

[6] "The injury which causes death is never regarded as constituting the crime of murder or manslaughter. The death of the victim not only within a year and a day, but also within the same jurisdiction was the controlling element which distinguished the guilt of the assailant from a common assault. The time and place of death were always considered as necessary to be averred, and were required to be averred as independent of the averments of assault. *Until provided for by statute, death in one county from an attack in another did not make murder in either county.*" (Emphasis added.)

All that *Chapman, supra*, decides is that the correct time and place of the death must be alleged in an information charging homicide and that the fact of death is essential to the prosecution.

*People* v *Tyler,* 7 Mich 161, 208–209 (1859) (here-inafter *Tyler I*).[7]

Justice CAMPBELL dissented in *Tyler II,*[8] 8 Mich 320 (1860) and rejected the doctrine of "constructive presence" apparently adopted by the majority. In the course of a lengthy dissent Justice CAMPBELL interprets the common law as providing for trial at the place of the blow. He commented on the common law as follows:

"The old rule requiring every offense tried in the common law courts to be inquired of in the county where it occurred, originated in the peculiar constitution of the early juries. They were not selected merely to hear evidence and pass upon it. They were witnesses, as well as triers, and were supposed to act on knowledge derived in their own vicinage.

---

[7] *Tyler I* and *Tyler* v *People,* 8 Mich 320 (1860) (hereinafter *Tyler II*) involved a death in St. Clair County from a wound inflicted by the defendant on a ship situated on the Canadian side of the St. Clair River. The issue before the Court in *Tyler I* was whether the Federal Crimes Act of 1857 intended to provide for the punishment of the offense in question. The Court said that no act of Congress then in force could be construed to embrace the fact situation. *Tyler I,* at 217. Although the reasoning of the case (as to whether the Great Lakes comes within a statutory definition of "high seas etc.") has been discredited by a later United States Supreme Court decision, *United States* v *Rodgers,* 150 US 249; 14 S Ct 109; 37 L Ed 1071 (1893), there is dicta by Justice CAMPBELL in *Tyler I* which seems to support appellant's contention:

"Homicide has always been treated as an offense depending on locality, and it is so regarded by the act of congress under which Tyler was indicted. *Where death does not immediately follow the mortal blow, and happens in another jurisdiction within the realm, the place of death was generally, under the views taken by the common law authorities, the proper place of jurisdiction;* inasmuch as the crime was not complete without it. There is some doubt whether, at the common law, originally such offenses were provided for at all. But, as the blow itself may be made a punishable assault, there is no very good reason for not allowing it to be punished as an assault, qualified by its natural and legitimate consequences: 1 *Bish. Cr. L.,* §§ 554, 555." *Tyler I,* at 208–209. (Emphasis added.)

[8] In *Tyler II* the defendant was charged with the crime under the predecessor to MCLA 762.6 providing for jurisdiction in the county of death when a mortal wound was given on the high seas or any other navigable waters. The Court held the statute was a proper exercise of the legislature's power.

Where an inquiry was necessary into matters occurring in different counties, there was no adequate machinery for conducting it. *The rule survived its reason, and has been maintained since for convenience rather than necessity, and may, therefore, be modified upon proper occasion.* But, formerly, if a fatal blow was given in one county, and death happened in another, the homicide could not be within the knowledge of the jurors of either county; those who could speak as to the blow having no means of ascertaining the death, and *vice versa. But it was settled that, by carrying the dead body into the county where the wound was given, so that death could be shown by view, the offense might be tried there:* 1 *Bish. Cr. L.,* § 554, and citations. And although it may be regarded as doubtful, there are, nevertheless, very high authorities for saying that, at common law (but probably when jury trials became more improved) a trial might always be had in the county where the mortal blow was given, *'for that alone is the act of the party, and the death is but a consequence:'* 1 *East P.C.,* 361; 1 *Hale P.C.,* 426; 1 *Bish. Cr. L.,* § 454. And it was also necessary at common law, originally, in a case of this kind, to remove the body to the county where the injury was given, in order to have the coroner's inquest: 1 *East P.C.,* 361; 1 *Hale P.C.,* 426; 2 *Hale P.C.,* 66." *Tyler II,* 338–339. (Emphasis added except the phrase 'for that alone is the act of the party, and the death is but a consequence:' wherein emphasis is in the original.)

Justice CAMPBELL in the course of his opinion buttressed his statement as to what the common law was by referring to three common law cases as follows:

"In *Rex* v. *Hargrave,* 5 *C. & P.,* 170, *it was expressly decided,* in a case tried in 1831, *where the stroke was given in one county and the death occurred in another, the felony was in the first county.*

The indictment stated that J. C. assaulted the deceased at, etc., in the county of Middlesex, etc., of which he languished and died in Kent; * * * (the court said) *'the giving of the blows which caused the death constitutes the felony.* The languishing alone, *which is not any part of the offense,* is laid in Kent;' * * * ." *Id,* 345. (Emphasis added except "which is not any part of the offense" where emphasis is in original.)

\*       \*       \*

"In *Cole's Case, Plowden,* 401, Cole was indicted for the murder of Elizabeth Pembroke, * * * (and) Cole pleaded an intermediate pardon of all felonies, misdemeanors and offenses. *It was insisted that his act did not become a felony until the death,* * * * . But the *'justices agreed that the pardon discharged him, because the wound given by the prisoner was the cause of the felony; the giving of which wound was an offense* and misdemeanor against the queen; and that being pardoned by the act, *all the consequences that followed from the said offense are also pardoned thereby.'* *Id,* 346. (Emphasis added.)

"In *Riley* v. *The State,* 9 *Humph.,* 646, where the question of venue under the constitution was involved, the injury and death being in different places, the court say: [*sic*] 'Although at common law it was said the offense was not complete until the death, yet *it would be doing violence to language to say that the offense was committed in the county where the death happens, although the stroke was committed in another county.'* " *Id,* 346. (Emphasis added.)

Other than the opinions of Justice CAMPBELL in the three Michigan cases just discussed, there appears no other direct statement by our courts of what this Court has construed the common law to be. A unanimous decision of this Court in *People* v *Southwick,* 272 Mich 258 (1935), however, raises a strong im-

plication that, absent a statute such as MCLA 762.5,
an accused must be tried where the murder is com-
mitted and that would be where the blow was given.
In *Southwick, supra,* the defendant doctor was
charged with manslaughter by abortion from
injuries inflicted in Jackson County when the
mother's death occurred in Oakland County. On ap-
peal the defendant charged that the Oakland County
Court, where the death occurred, had no jurisdiction
because the crime was "committed" in Jackson
County. In answer the Court, through Justice
SHARP, said:

"The general rule relative to jurisdiction is well
settled in *People* v. *Richards,* 247 Mich. 608, wherein
the court said: *'the right of an accused to be tried in
the jurisdiction where it is alleged he committed
crime is ancient and valuable* and should be main-
tained.' *However, to this general rule there are cer-
tain well recognized exceptions.* We have upheld
legislative enactments which have authorized the
prosecution of offenses in counties *other than those
in which the offense was actually committed.*

        \*      \*      \*

"Section 17123, 3 Comp. Laws 1929, provides:
" 'If any mortal wound shall be given or other vio-
lence or injury shall be inflicted, or any poison shall
be administered in one county by means whereof
death shall ensue in another county, the offense may
be prosecuted and punished in either county.'
"The defendant in the instant case was charged
with having 'wilfully and unlawfully' used certain
instruments in and upon the body of a pregnant wo-
man, with intent to procure a miscarriage, and that
he did thereby inflict upon her certain injuries of
which she died. The wilful injuries were inflicted in
Jackson county and death occurred in Oakland
county. We think the statute is broad enough to
cover this class of cases." 272 Mich 258, 261–262.
(Emphasis added.)

By plain implication the Court is saying that absent the "either county" statute (MCLA 762.5) jurisdiction to try the offense of manslaughter would have been in Jackson County where the injuries were inflicted because that is where the offense was *"actually committed"* and the statute merely creates an alternative jurisdiction. This construction is consistent with our reading of Justice CAMPBELL's analysis of the common law in *Tyler II* to the effect that jurisdiction where the blow is given was the common law prior to the enactment of the venue statute of 2 and 3 Edward VI, c. 24.

To summarize, there is no Michigan case directly in point on jurisdiction where the injury occurs in one place and the death in another. The dicta are contradictory but lean toward jurisdiction where the injury occurs.

### 3 — *English Common Law Prior to Statutory Modification*

Because of the lack of precedent or clear and definitive statement in Michigan cases on the pre-statutory common law as to jurisdiction where the injury occurs in one place and the death in another, we have made research on such common law along the following four lines:

a) Original English cases
b) English authorities
c) American cases
d) American authorities.

### a) *Original English Cases*

The most important case on this matter is found in the Year Book of 7 Henry VII, verso 8 (Hillary Term 1492), incidentally more than 50 years before 2 and 3 Edward VI, c. 24 (1548). It dealt with the jurisdictional sufficiency of an indictment. Of the

four judges giving an opinion three held that there was jurisdiction in the place of the blow and one did not.

The essential part of the report follows :[9]

"A man was indicted because he had struck a man in the county of Middlesex whereof he died in the county of Essex. And the issue was whether he could be arraigned on this indictment or not, and whether the indictment was good or the Venire facias would issue in both counties.
*Tremaile:* It seems that it is not material where he died, because the blow is the principal thing; it requires death or otherwise it is not felony, but whether he died in one place or another is not material, and therefore it would have been a good verdict in my opinion that he was struck in such and such a place whereof he died, * * *
*Fairefax:* * * * the indictment is not good, because they will not be able to enquire of death in another county, * * *
*Hussey:* In my opinion, however, the indictment is good and they will be able to find the death in another county, because in divers cases the jury find things in another county, * * *
*Keble:* to the same effect, because in many cases where the jury has cognizance of the principal thing they will be able to enquire of the accessory thing although they are in a foreign county, because the principal thing obliges them to do so."

The case of *Rex* v *Hargrave,* 5 Car & P 170 (1831) (quoted by Justice CAMPBELL in *Tyler II* at page 345, see *supra,* p 311) illustrates that without reference to statute a case involving injury in one jurisdiction and death in another could be brought in the first. *Hargrave* raised the sufficiency of the pleading in an

[9] The whole case is reported in Appendix I. Translation was prepared for the Court from the original French text by Frederick L. Boersma, A.B. Harvard 1962, A.M. University of Michigan 1963, Ph.D. candidate, Department of History, University of Michigan.

indictment charging mortal blows in a boxing match in Middlesex County and death in Kent. The Court in holding the indictment good said:

"The giving of the blows which caused the death constitutes the *felony*. The languishing alone, which is not any part of the offence, is laid in Kent * * * ." (p 171.)

The case of *King* v *Coombes,* 168 Eng Rep 296; 1 Leach CC 388 (Ex 1785), is frequently cited for the proposition that the situs of homicide is where the death occurs. In particular, the following language is sometimes quoted from the report of the case:

"(If a loaded pistol be fired from the land at a distance of one hundred yards from the sea, and a man is maliciously killed in the water one hundred yards from the shore, the offender shall be tried by the admiralty jurisdiction; for the offence is committed where the death happens, and not at the place from whence the cause of death proceeds.)" 168 Eng Rep 296.

Upon reading the case, however, it is discovered that the quoted language is from no opinion of the Court in that case as none was printed. In the body of the "report" the reporter summarizes the holding of the Court simply:

"[A]nd they were of opinion, that the prisoner was tried by a competent jurisdiction." 168 Eng Rep 296–297.

The language so often cited is merely the headnote of the Sergeant and on the facts of the case it stands as much for the principle that jurisdiction lies where the deceased is *wounded* as it does for jurisdiction where death occurs since both events occurred within the admiralty jurisdiction.

### b) *English Authorities*

The following respected English authorities report the common law on alternate jurisdiction as follows:

Sir Matthew Hale said in 1 Hale, Pleas of the Crown, p 426 (1736):

"At common law, if a man had been stricken in one county and died in another, it was doubtful whether he were indictable or triable in either, but the more common opinion was, that he might be indicted, where the stroke was given, for the death is but a consequent, and might be found tho in another county, 9 E. 4. 48. 7 H. 7. 8. and if the party died in another county, the body was removed into the county, where the stroke was given, for the coroner to take an inquest *super visum corporis,* 6 H. 7. 10. but now by the statute of 2 & 3 E. 6. cap. 24. the justices or coroner of the county, where the party died, shall inquire and proceed, as if the stroke had been in the same county, where the party died."

Later authorities have fully recognized the view of Lord Hale. In 1 Hawkins, Pleas of the Crown, c. 31, § 13 (1716), the author says at pp 79–80:

"*Sect.* 13. It is said by some, That the Death of one who died in one County, of a Wound given in another, was not indictable at all at Common Law, because the Offence was not compleat in either County, and the Jury could enquire only of what happened in their own County. But it hath been holden by others, That if the Corps were carried into the County where the Stroke was given, the whole might be enquired of by a Jury of the same County: * * * ."

In 1 East, Pleas of the Crown, p 361, (1806), the author says:

"Where the stroke and death are in different counties, it was doubtful at common law whether the

offender could be indicted at all, the offence not being complete in either; though the more common opinion was, that he might be indicted where the stroke was given; for that alone is the act of the party, and the death is but a consequence, and might be found though in another county: and the body was removed into the county where the stroke was given."

In this matter Lord Coke was an "uncertain" trumpet. Writing in the Institutes, he said:

"And before the making of the statute of 2 E. 6. if a man had been feloniously stricken, or poysoned in one county, and after had died in another county, no sufficient indictment could thereof have been taken in either of the said counties, because by the law of the realm, the jurors of one county could not inquire of that, which was done in an other county.

"It is provided by that act (2 E. 6) that the indictment may be taken, and the appeal brought in that county, where the death doth happen. Before the making of this statute, *the appeal might have been brought in either of the said counties, but the trial must have been out of both:* but when both counties could not joyn, then both appeal and indictment failed at the common law." 3 Coke, Institutes 48 verso, 48 folio (1797). (Emphasis added.)

The fact of the matter was that both counties on occasion could and did join. And see the untitled case in Year Book of 7 Henry VII, verso 8 (Hillary Term 1492) quoted *supra,* where the judges said the jury in the one county could find out what was going on in the other county, apparently even without dragging the body from the county of death to the county of the blow.[10]

---

[10] The most recent case cited by Coke in the development of the common law authority is John Long's Case, Year Book 6 H. VII, p 10 (A.D. 1490) (Trinity Term 6 Henry VII, folio 10; London, Richard Tottell, 1555). In that case John Long struck a man with a shovel in Middlesex County and he died within the city of London. An indictment was brought in London but an "appeal" brought in

The English authorities therefore seem to recognize that in an early period jurisdiction lay only where the jurors had personal knowledge of the offense but that as time went on the common law developed the doctrine that where the injury occurred in one jurisdiction and the death in another, by dragging the body to the jurisdiction of injury trial might be had there. Later still juries in the jurisdiction of the blow might hear as well as see evidence of the death and the doctrine developed that the injury was the primary fact and death the consequence, therefore jurisdiction lay where the injury occurred.

### c) *American Cases*

The overwhelming majority of American cases recognize the principle that the common law considered the blow or poisoning the gravamen of homicide and the death but the consequence thereof.[11]

---

both counties could not succeed because London, with special privileges, was not required to join with Middlesex at the trial. Coke fails to mention that the court went on to say:

"In this case the device was employed of taking the dead man (that is, the body) into the county where he was struck, and then having the jury inquire and find that he was struck and died as a result."

The confusion over this case comes from the fact that the report finishes by saying: "Afterwards the felon paid his fee and was discharged." The reason he was discharged was not that neither county had jurisdiction but rather, as the report indicated, the courts of Middlesex where the blow was struck could proceed upon the view of the body but not the courts of London where the victim died, and where this indictment had been brought.

The renowned Blackstone didn't treat this matter very extensively. What he had to say is this:

"The grand jury are sworn to inquire only for the body of the county, *pro corpore comitatus;* and therefore they cannot regularly inquire of a fact done out of that county for which they are sworn, unless particularly enabled by an act of parliament. And to so high a nicety was this matter anciently carried, that where a man was wounded in one county and died in another, the offender was at common law indictable in neither, because no complete act of felony was done in any one of them; but, by statute 2 & 3 Edw. VI. c. 24, he is now indictable in the county where the party died." IV Blackstone 303 (1756).

Fifteen jurisdictions have had to face the issue head on as we have had to in this opinion and have reached the same conclusion on much the same cases

---

As Lord Coke observed if the counties joined, there could be a trial, and the case in Year Book Henry VII indicated that a dynamic common law was forging ahead even further in finding jurisdiction.

[11] FEDERAL CASES: *United States v Guiteau*, 1 Mackey 498; 47 Am Rep 247 (1882); *Ball v United States*, 140 US 118; 11 S Ct 761; 35 L Ed 377 (1891).

ALABAMA: *Green v State*, 66 Ala 40; 41 Am Rep 744 (1880).
ARKANSAS: *State v Chapin*, 17 Ark 561; 65 Am Dec 452 (1856).
CALIFORNIA: *People v Gill*, 6 Cal 637 (1856).
FLORIDA: *Roberson v State*, 42 Fla 212; 28 So 427 (1900).
GEORGIA: *Simpson v State*, 92 Ga 41; 17 SE 984 (1893).
ILLINOIS: *Kirkham v People*, 170 Ill 9; 48 NE 465 (1897).
INDIANA: *Archer v State*, 106 Ind 426; 7 NE 225 (1886).
KANSAS: *State v Bowen*, 16 Kan 475 (1876).
KENTUCKY: *Commonwealth v Jones*, 118 Ky 889; 82 SW 643 (1904); *Commonwealth v Ball*, 126 Ky 542; 104 SW 325 (1907); *Commonwealth v Apkins*, 148 Ky 207; 146 SW 431 (1912).
LOUISIANA: *State v McCoy*, 8 Rob (La) 545; 41 Am Dec 301 (1844).
MAINE: *State v Kelly*, 76 Me 331; 49 Am Rep 620 (1884).
MARYLAND: *Stout v State*, 76 Md 317; 25 A 299 (1892); *Kelley v State*, 181 Md 642; 31 A2d 614 (1943).
MINNESOTA: *State v Gessert*, 21 Minn 369 (1875); *State v Smith*, 78 Minn 362; 81 NW 17 (1899).
MISSOURI: *State v Blunt*, 110 Mo 322; 19 SW 650 (1892); *State v Garrison*, 147 Mo 548; 49 SW 508 (1898).
NEBRASKA: *Debney v State*, 45 Neb 856; 64 NW 446 (1895).
NEW JERSEY: *State v Carter*, 27 NJL 499 (1859); *Hunter v State*, 40 NJL 495 (1878).
NEW MEXICO: *State v Montes*, 22 NM 530; 165 P 797 (1917).
NORTH CAROLINA: *State v Hall*, 114 NC 909; 19 SE 602 (1894).
OHIO: *Robbins v State*, 8 Ohio St 131 (1857).
OKLAHOMA: *Albright v Territory*, 11 Okla 497; 69 P 789 (1902); *Moran v Territory*, 14 Okla 544; 78 P 111 (1904).
PENNSYLVANIA: *Commonwealth v Bingaman*, 51 Pa Sup Ct 336 (1912).
TENNESSEE: *Riley v State*, 28 Tenn (9 Humph) 646 (1849).
WASHINGTON: *State v Baldwin*, 15 Wash 15; 45 P 650 (1896).
WEST VIRGINIA: *Ex Parte McNeeley*, 36 W Va 84; 14 SE 436 (1892).
See Appendix II.
But see *contra*: *United States v Bladen*, Fed Cas #14605 (1809).
MASSACHUSETTS: *Commonwealth v Macloon*, 101 Mass 1; 100 Am Dec 89 (1869).
VIRGINIA: *Commonwealth v Linton*, 2 Va Cr Cas (Va) 205 (1820).
WISCONSIN: *State v Pauley*, 12 Wis 537 (1860). (Dicta.)
See Appendix II.

and authorities.[12]   Three jurisdictions have relied on the same cases and authorities to similarly evaluate the common law in interpreting a pertinent determinative statute or relied on the common law as an alternate basis of decision.[13]   Eight jurisdictions have in the course of their opinions commented more or less directly on the whole or a part of this common law doctrine.[14]   Only two jurisdictions have decided otherwise.[15]

---

[12] Direct common law cases:

\* *United States* v *Guiteau,* 1 Mackey 498; 47 Am Rep 247 (1882); and see *Ball* v *United States,* 140 US 118; 11 S Ct 761; 35 L Ed 377 (1891).

\* *Green* v *State,* 66 Ala 40; 41 Am Rep 744 (1880).

\*\* *Kirkham* v *People,* 170 Ill 9; 48 NE 465 (1897).

\*\* *State* v *Bowen,* 16 Kan 475 (1876).

\* *Commonwealth* v *Ball,* 126 Ky 542; 104 SW 325 (1907).

\* *Commonwealth* v *Apkins,* 148 Ky 207; 146 SW 431 (1912).

*State* v *Kelly,* 76 Me 331; 49 Am Rep 620 (1884).

\* *Stout* v *State,* 76 Md 317; 25 A 299 (1892).

*State* v *Gessert,* 21 Minn 369 (1875).

*State* v *Smith,* 78 Minn 362; 81 NW 17 (1899).

*State* v *Garrison,* 147 Mo 548; 49 SW 508 (1898); and see *State* v *Blunt,* 110 Mo 322; 19 SW 650 (1892).

\* *State* v *Carter,* 27 NJL 499 (1859); and see *Hunter* v *State,* 40 NJL 495 (1878).

\*\* *State* v *Montes,* 22 NM 530; 165 P 797 (1917).

\*\* *Albright* v *Territory,* 11 Okla 497; 69 P 789 (1902); and see *Moran* v *Territory,* 14 Okla 544; 78 P 111 (1904).

\* \*\* *Riley* v *State,* 28 Tenn (9 Humph) 646 (1849).

\*\* *State* v *Baldwin,* 15 Wash 15; 45 P 650 (1896).

\* These cases have good discussion of English cases and authorities.
\*\* These cases say averment of place of death unnecessary because place of blow is where crime occurred.

[13] Statutory interpretation or alternate basis:

*Roberson* v *State,* 42 Fla 212; 28 So 427 (1900);

*Archer* v *State,* 106 Ind 426; 7 NE 225 (1886);

*State* v *McCoy,* 8 Rob (La) 545; 41 Am Dec 301 (1844).

[14] Blow is essence of homicide but jurisdictional question not determinative; general dicta:

*State* v *Chapin,* 17 Ark 561; 65 Am Dec 452 (1856);

*People* v *Gill,* 6 Cal 637 (1856);

*Simpson* v *State,* 92 Ga 41; 17 SE 984 (1893);

*Debney* v *State,* 45 Neb 856; 64 NW 446 (1895);

*State* v *Hall,* 115 NC 811; 20 SE 729 (1894);

*Robbins* v *State,* 8 Ohio St 131 (1857);

*Commonwealth* v *Bingaman,* 51 Pa Sup Ct 336 (1912);

*Ex Parte McNeeley,* 36 W Va 84; 14 SE 436 (1892).

[15] *United States* v *Bladen,* Fed Cas #14605 (1809);

Illustrative of the cases which deal with our issue directly are *Stout* v *State,* 76 Md 317 (1892); *State* v *Carter,* 27 NJL 499 (1859); and *United States* v *Guiteau,* 1 Mackey 498; 47 Am Rep 247 (1882).

In *Stout* v *State, supra,* the blow was given in Maryland with death ensuing in Philadelphia, Pennsylvania. As in our case there was a statute governing the place of trial as between counties (place of the stroke) but there was no statute expressly conferring jurisdiction when the death ensued outside the state. The court did not hold the venue statute applicable but, after a review of the common law authorities, said that the statute was merely in affirmance of the common law and that:

" * * * the same reason and principle equally apply to the case where the mortal blow or poison is given in any county of this State, and the party so stricken or poisoned shall, in consequence of the blow or poison, die out of the State * * * . The grade and characteristics of the crime are determined immediately that death ensues, and that result relates back to the original felonious wounding or poisoning. The giving the blow that caused the death constitutes the crime." 76 Md 317, 324.

In *State* v *Carter,* 27 NJL 499 (1859), the question was whether the courts of New Jersey had jurisdic-

*Commonwealth* v *Linton,* 2 Va Cas (Va) 205 (1820).

The cases cited by appellant do not persuade us that our reading of the common law can be otherwise. *Chapman* v *People,* 39 Mich 357 (1878), and the *Tyler* cases are discussed, *supra,* pp 309–310 and do not present unassailable support for either of the parties. Athough *United States* v *Bladen, supra,* supports appellant's position it relies on the minority view of Lord Coke and is contrary to the *Guiteau* case which was approved of in strong dicta in *Ball* v *United States,* 140 US 118 (1891). Appellant's reliance on an out-of-context statement in *Ball* is misplaced for the same reason. *Commonwealth* v *Linton, supra,* also supports appellant's contention but it cites no authority and is contrary to the weight of authority (see footnote 11). *Commonwealth* v *Macloon,* 101 Mass 1 (1869) was concerned with the validity of a statute like that in *Tyler II, supra,* and the dicta supporting appellant fails to recognize more recent authority.

tion to prosecute for manslaughter when the blow
was struck in New York and the defendant died in
New Jersey.    There was no statute governing the
case and in dismissing the indictment the Court after
reviewing the common law authorities said:

"This is not the case where a man stands on the
New York side of the line, and shooting across the
border, kills one in New Jersey.   *   *   *   In all cases
the criminal act is the impinging of the weapon,
whatever it may be, on the person of the party in-
jured, and that must necessarily be where the im-
pingement happens."   27 NJL 499–500.

The most definitive Federal case is *United States
v Guiteau,* 1 Mackey 498; 47 Am Rep 247 (1882), al-
though the ultimate decision rested on statutory
construction.   The Court observed:

"The contention on the part of the defendant is
that murder ·cannot be held to have been committed
within the District of Columbia, since the consequent
death happened in the State of New Jersey, and
that therefore the court has no jurisdiction to try,
convict, and sentence him for murder."   (47 Am
Rep 247–248.)

The Court concluded:

"But if there be reason for any doubt whether
Congress intended to use this phrase in the sense of
the common law, then we hold that according to the
principle of that law, murder is committed within the
District of Columbia when the felonious blow is
struck here, notwithstanding the consequent death
happen without the District and in one of the
States."   (47 Am Rep 247, 254–255.)

Prior to reaching that conclusion, the Court, com-
prehensively reviewed the common law, in part as
follows:

"The earlier common law authorities seem to have no doubt as to where the felony was committed in such a case; and they seem to have had no doubt even as to the cognizance of the jury, if the facts could be brought to them. But doubts on this point certainly did grow up, and the actual condition of opinion, when the statute of Edward VI was passed, is fairly stated by Hale.

" 'At common law [says that great authority] if a man had been stricken in one county and died in another, it was doubtful whether he were indictable or triable in either; but the more common opinion was that he might be indicted where the stroke was given, for the death is but a consequent, and might be found though in another county (9 Ed. IV, 48; 7 Hen. VII, 8); and if the party died in another county, the body was removed into the county where the stroke was given, for the coroner to take an inquest *super visum corporis* (6 Hen. VIII, 10); but now, by the statute of 2 and 3 Edward VI, chapter 24, the justices or coroner of the county where the party died shall inquire and proceed as if the stroke had been in the same county where the party died.' 1 Hale P.C. 426.

"The learned Chief Justice ABBOTT, speaking in the case of *Rex* v. *Burdett,* 4 B. & Ald. 169, has assigned to Hale his proper place by treating him as much higher authority than the preamble of the statute of Edward VI, touching the previous condition of the common law.

" 'It seems somewhat extraordinary [said he] that the preamble of the statute should be expressed in the terms in which we find it, because Lord Hale mentions the point as being doubtful at common law, and says *the more common opinion was that the party might be indicted where the stroke was given.'*

"We think it is quite safe to have the same confidence in Lord Hale's reading of the history of this question, which was thus expressed as a matter of

course by Chief Justice Abbott." (47 Am Rep 247, 252–253.) (Emphasis added.)

In *Ball* v *United States,* 140 US 118, 133–134 (1891), the United States Supreme Court favorably reviews *United States* v *Guiteau, supra,* and quotes Justice Bradley's approval of *Guiteau* in his opinion responding to a request for a writ of *habeas corpus* testing it. It repeats Bradley's praise of Lord Chief Justice Hale and quotes him substantially as we have just done (p 134). The indictment, however, was held invalid for failure to state essential ingredients of the offense charged.

### d) *American Authorities*

In addition to the English cases and authorities and American case law the weight of authority of American scholars supports the view that jurisdiction lies in the place where the blow was given absent a statute.

The respected Commentaries on the Law of Criminal Procedure of Joel Prentiss Bishop (2d ed 1872) state:

"[T]he courts are said to have anciently doubted, whether, if a blow were inflicted in one county, and death from the blow followed in another, the offence could be prosecuted in either. 'This difficulty,' says Starkie, 'was frequently avoided by carrying the dead body back into the county where the blow was struck, and there the jury might inquire both of the stroke and the death.' *But the true view appears to be, that the blow is murder or not, according as it produces death within a year and a day or not; and therefore in all cases an indictment lies in the county where the blow was given. If the death takes place out of the country, the question possibly involves another principle, conducting to a different result, but probably not; and therefore we may doubt the soundness of a Virginia decision* [referring to *Com-*

*monwealth* v *Linton,* 2 Va Cas 205 (1820)] holding, that, where a man is stabbed in one State and dies of his wounds in another, the offender cannot be held in the former State for the murder." 1 Bishop, Commentaries on Criminal Procedure, § 51. (Emphasis added.)

In Stimson, Conflict of Criminal Laws (1936) the author reviews the common law and American authorities carefully on pp 57–63. In discussing the issue in the instant case the author concludes:

"In all other cases, in which no statute was involved, it has been held that the law violated is the law of the state where the blow was inflicted or poison given. The accused can be tried there and not where the victim died. The reason is that the law applicable to an individual is the law of the place where he acts or fails to perform a duty. It is his act or omission which is made criminal, and although the act or omission is not homicide unless death ensues, the subsequent death is merely a result which relates back and characterizes the act or omission." Stimson, Conflict of Criminal Laws (1936), p 61. (Footnotes omitted.)

4 Wharton, Criminal Law & Procedure, § 1507 addresses this issue as follows:

"When a wound is inflicted in one state which causes death in another, *it is the state in which the wound was inflicted which, in the absence of statute has jurisdiction over the resulting homicide.* The crime is complete in the jurisdiction in which the act which causes death is done, and the death itself is regarded merely as a consequence. The mere circumstance that the death occurs within one state does not, in the absence of a statute to the contrary, give jurisdiction to the courts thereof if the injury resulting in the death was inflicted in another state or country." § 1507, pp 89–90. (Emphasis added, footnotes omitted.)

In 40 Am Jur 2d, Homicide, § 198, the authors state:

"The general rule, both at common law and under statutes declaratory thereof, is that *a homicide is committed in the state where the fatal wound or blow was given* and, accordingly, that the courts of that state alone have jurisdiction to try the slayer for murder or manslaughter and to punish him for the offense of which he is found guilty, even though in point of fact, the deceased died in another state. The crime is complete in the jurisdiction in which the act which causes death is done, and the death itself is regarded merely as a consequence. The mere circumstance that the death occurs within one state does not, in the absence of a statute to the contrary, give jurisdiction to the courts thereof if the injury resulting in the death was inflicted in another state or country." (Footnotes omitted, emphasis added.) § 198, p 478.

3 Warren on Homicide, § 298 (1938) was cited by the Court of Appeals as follows:

"According to the weight of authority it is the rule of the common law as adopted in this country that the courts of the state where the mortal wound was inflicted have jurisdiction of the offense, though the deceased died in another state; and in some jurisdictions this rule is expressly sanctioned by statute." § 298, p 475. (Footnote omitted.)

In Clark & Marshall, Law of Crimes (4th ed), § 510, the authors state at pp 681–682:

"It has been held that a person who administers a poison or otherwise inflicts an injury in one state or territory, resulting in death in another state or territory, cannot be punished for homicide in the latter, but most courts hold that he can be punished in the former, on the ground that the homicide is committed where the injury is inflicted, and the

death is a mere consequence." (Footnotes omitted.)[16]

The commentary accompanying *Proposed Michigan Revised Criminal Code,* Final Draft, September, 1967, § 140 at pp 16–17 states the following:

"The weight of authority at common law is that the venue in a homicide case is properly laid where the blow is struck, even though death. occurs elsewhere."

## CONCLUSIONS

Upon our review of the cases and authorities in England and in this country we are satisfied that as between counties the common-law rule is that jurisdiction to prosecute for manslaughter or homicide lies at the place where the blow was given. There appears no common law case on the question of where jurisdiction lies when a blow would be given in England and death would occur outside of England, for example, in France. Although it is conceivable that this situation might conduct to a different result, we are of the opinion that the logic of the situation would rest jurisdiction where the blow was given regardless of where the victim died. As we have seen, the American cases come to just this conclusion, *United States* v *Guiteau, supra; Commonwealth* v *Ball, supra; Commonwealth* v *Apkins, supra; Stout* v *State, supra; State* v *Garrison, supra; State* v *Carter, supra; Hunter* v *State, supra.*

---

[16] See generally:

Berge, *Criminal Jurisdiction and the Territorial Principle,* 30 Mich L Rev 238, 239–240 (1931); Blume, *The Place of Trial of Criminal Cases,* 43 Mich L Rev 59, 61 (1944); Cook, *The Logical and Legal Bases of the Conflict of Laws,* 33 Yale L J 457, 460–464 (1924); 22 CJS, Criminal Law § 136n, p 363; George, *Extraterritorial Application of Penal Legislation,* 64 Mich L Rev 609 (1966); May, *Criminal Law,* § 77 *et seq.,* p 60 *et seq.;* Perkins, *The Territorial Principle in Criminal Law,* 22 Hastings L J 1155 (1971); Note, *Jurisdiction over Interstate Homicides,* 10 La L Rev 87 (1949).

We hold that under the common law as adopted in Michigan and continuing in force, jurisdiction to prosecute for murder or manslaughter lies in the place where the blow was given when the victim dies outside the State of Michigan. The Circuit Court of Cass County had jurisdiction to try this case.

## ISSUE TWO — GUILTY PLEA

Having established the jurisdiction of the trial court to hear this case, we turn now to the second issue before us, whether the defendant's plea of guilty was properly accepted.[17] Counsel for defendant has favored us with a vigorous and thought-provoking argument.

Counsel for defendant argues first that the guilty plea taking revealed "that Appellant had no personal knowledge of the facts of his alleged crime";[18] second that "[t]he Court itself put the words into Duffield's mouth which it then used to sustain his conviction"; and third the requirement of MCLA 768.35; MSA 28.1058 that " * * * whenever said judge shall have reason to doubt the truth of such plea of guilty, it shall be his duty to vacate the same * * * " is an "*objective* standard" (his emphasis).

The Court of Appeals considered this part of defendant's argument as follows:

---

[17] Though counsel did not raise this fact, we note that the trial judge in accepting defendant's plea did not advise him on the record of his right against self-incrimination or his right to confront his accusers. In *Boykin* v *Alabama,* 395 US 238, 243; 89 S Ct 1709; 23 L Ed 2d 274 (1969) the United States Supreme Court required that the defendant be advised of these rights on the record.

*Boykin, supra,* however, was decided in 1969. The defendant's plea in the instant case was accepted in 1967. We held in *People* v *Butler,* 387 Mich 1 (1972) that the *Boykin* requirements would not be applied retrospectively.

See *People* v *Rufus Williams,* 386 Mich 277 (1971) for a recommended procedure in plea-taking.

[18] " * * * [T]he plea was freely, understandingly, and voluntarily made * * * " GCR 1963, 785.3(2).

"The trial court concluded that in this particular case, defendant indicated during the entering of his guilty plea that there were some things he did not recall and there were some things which he indicated that he knew only by what he had heard. The trial court stated:

" 'But there were other things, and they were important things, such as inflicting the injury with his fists, that he was in a fight with this man, that he was there at the place, and things of this kind, and many of which came right after saying, "Well, I don't remember about that, but I do remember about this", so I can't see where there was any confusion in his mind whatsoever.'

" 'And from the examination, the court satisfied itself and he had in fact engaged in a fight with John Henry Frazier, and that as a result of this fight, John Henry Frazier had come to his death.'

"It is clear that the defense of voluntary intoxication is not available in a non-specific-intent crime like manslaughter.

"The real question is whether the defendant understood the events surrounding the death of the victim well enough to intelligently enter a plea of guilty. Although the court at the arraignment asked defendant leading questions, nevertheless the defendant, represented by counsel, admitted that he got into a fight with the victim, that he hit the victim with his fist or something of this kind, that he remembers he had the victim down on the floor and was hitting him with his fists.

"The trial judge did not abuse his discretion in accepting the plea and there was no miscarriage of justice." 20 Mich App 473, 480-481.

It appears to this Court that there are in reality two questions raised by defendant; the one considered by the Court of Appeals and the second raised more particularly by defendant's third point did the judge "have reason to doubt the truth of

such plea of guilty". *Barrows*[19] put it—has the judge established by direct questioning " * * * the crime and the participation therein of the person pleading guilty" and secondarily "  *  *  * does this record convince us of the truth of the plea." *People* v *Rufus Williams,* 386 Mich 277, 284 (1971). Both questions require examination of the same facts.[20]

As defendant's first point indicates, defendant's response to the judge's question: "Tell me in your own words just what happened" was: "To be truthful with you, I don't exactly know what happened. I was drinking." If the colloquy had ended there defendant's first point would be unassailable.

However, the court's very next question was: "Well, you know you were out there, don't you?" To which defendant replied: "Yes, I know that I was there. Yes."

The court then asked "And you know you got in a fight with Frazier?" To which defendant replied: "Yes." The court asked at least three more questions, the answers to which all established that defendant knew he fought with the deceased that night.

The court established by these and other questions and answers by defendant

— that defendant was 23 and the deceased 50

— that the deceased was "[n]ot very big".

— that defendant remembered he "had him down on the floor and [he was] hitting him with [his] fists".

— that defendant didn't "know exactly where I hit him him at" but

— that defendant didn't think he "used any weapon"

---

[19] *People* v *Barrows,* 358 Mich 267 (1959).

[20] The record of the arraignment where the guilty plea was taken is set out in full in Appendix III.

—that defendant didn't remember the reason for the fight but he did remember "[h]e [the deceased] only owed me fifty cents"

— that defendant remembered leaving but didn't remember whether he left the deceased lying on the floor

— that he remembered that "[t]hey took him [the deceased] to the hospital the next day."

How do defendant's three points stand up on the basis of the record and the law?

One, "[a]ppellant had no personal knowledge of the facts of his alleged crime": It is celar the defendant did not remember some things but did remember other things. For example this exchange:

*"The Court:* You think you beat him with your fist or something of this kind?

*"Respondent:* Yeah. I don't think I used anything, though."

What defendant did remember was sufficient to establish a crime and his participation in it.

Two, "[t]he Court itself put the words into Duffield's mouth  *  *  *  ." The usual complaint of defense counsel and appellate courts is that the trial court was not vigorous enough in questioning the defendant to establish the truth of the matter. Here the trial court gave defendant the option to tell in his "own words just what happened". When this proved unproductive, the court turned to establishing the facts by close questioning. The questions were quite pointed. The defendant, however, was not without a mind of his own. For example, defendant under pressure of several questions kept reiterating that he couldn't remember that the deceased "was lying there on the floor" when defendant left the scene of the fight, but immediately thereafter agreed he had hit the deceased.

If the defendant will respond fully in his own words that is surely preferable, but MCLA 768.35; MSA 28.1058 enjoins the judge "before pronouncing judgment or sentence upon such plea, to become satisfied after such investigation as he may deem necessary for that purpose * * * ." This the judge did.

Three, "whenever said judge shall have reason to doubt the truth of such plea of guilty" is an objective standard. No judicial act can lawfully be arbitrary or capricious. In this case the judge established a record on which he made his judgment and he went further and stated the reasons on which he acted. On appeal it cannot be said the judge's action was not within the statute, although any judge always has the option to refuse any plea of guilty.

In passing we note that we said in *People* v *Rufus Williams, supra,* at 285:

"As to the second criterion, being convinced that the defendant was or was not innocent, the facts in *Williams* are that the defendant did not claim to be innocent but rather he sought to exculpate himself on the grounds of drunkenness."

The record likewise indicates this is true in this case. Affirmed.

T. M. KAVANAGH, C. J., and ADAMS, T. E. BRENNAN, and SWAINSON, JJ., concurred with WILLIAMS, J.

## APPENDIX I

(Translation was prepared for the Court from the original French text by Frederick L. Boersma, A.B. Harvard 1962, A.M. University of Michigan 1963, Ph.D. candidate,

Department of History, University of Michigan.)

Hillary 7 Henry VII (1492):

A man was indicted because he had struck a man in the county of Middlesex whereof he died in the county of Essex. And the issue was whether he could be arraigned on this indictment or not, and whether the indictment was good or the Venire facias would issue in both counties.

*Tremaile:* It seems that it is not material where he died, because the blow is the principal thing; it requires death or otherwise it is not felony, but whether he died in one place or another is not material, and therefore it would have been a good verdict in my opinion that he was struck in such and such a place whereof he died, showing no place of death, and even though the place is shown, yet the indictment is none the worse, but in that case now it seems to me that the neighbourhood will come from both counties, because the blow is shown in the indictment in one county and the death in the other.

*Fairefax:* It is a good indictment if it did not appear in the indictment that he died in another county, because they will be able to say that he struck him in such and such a place whereof he died in that place and the indicted person will not have the advantage of showing that he died in another county; but here it does appear in the indictment, and therefore the indictment is not good, because they will not be able to enquire of death in another county, wherefore the indictment is void.

*Hussey:* The showing of death in the indictment will not make it the worse, because if the law be such that they cannot enquire of things in another county, then if they find that he struck a man in the one county, whereof he died in the same county, whereas

in reality he died in another county, this is not good
in law, because they are then perjurers. Although
it does not appear in the indictment, still they have
to find the death, which they do not have the power
to find, if the law is thus: quare hoc possumus quod
de iure possumus. Therefore, if they are not able
to find that if it appears, no more can they find it
tacitly when it does not appear. Thus according
to this argument they cannot find tacitly something
which does not appear. In my opinion, however, the
indictment is good and they will be able to find the
death in another county, because in divers cases the
jury find things in another county, as in the common
case of the statute of skipper wherein enquiry is
made in other places than Calais, or in another stat-
utory case wherein a man may not make freight with
any other than an English boat at Bordeaux, if one
is there. And in the common case of alleging that
a man is an alien, born and engendered in another
country, this will be tried here 'and the defendant
will come into the court and show that he was born
in England. And with regard to this issue the neigh-
bourhood will come to decide whether he was born in
that place or not, as I believe. And likewise it seems
that because they have notice of the principal thing
the jury will be able to enquire concerning death with
regard to the accessory, as in trespass release may
be pleaded in a foreign county and homage can be
tendered in a foreign county and issue taken on it:
in these cases the jurors of the foreign county may
find damages.

*Keble:* To the same effect, because in many cases
where the jury has cognizance of the principal thing
they will be able to enquire of the accessory thing
although they are in a foreign county, because the
principal thing obliges them to do so. For instance,
where a man has a rent granted by deed in one coun-

ty out of land in another county and is seised and disseised and then brings the assise and the assise is taken by default, in this case the jurors will be obliged to find the grant made by deed in another county, otherwise they will not be able to find any disseisin, because without a grant made of the rent, there can be no disseisin. And the law is the same where a release is made of a rent in a foreign county, and the assise is brought and is taken by default or for no tort no disseisin, for in this case the jury find the release in a foreign county in this assise of rent, and then they find the verdict of no disseisin. And likewise if a man makes a lease and then a release in a foreign county, in this case in an assise the jury find no tort no disseisin and enquire of this lease and release. And thus where they have cognizance of the principal, they may be obliged to find the accessory in a foreign county, because they are obliged by the meaning of the law to have cognizance of it and are enabled so to do. Conversely, it seems to me that the jury where he died can find his death and that he was struck in another county, causa qua supra. And if a man brings an action of debt for his salary because he was retained in service in Brigg beyond the seas and the master says that he dismissed him or that he did not serve, this issue will be tried here where the writ is brought, query as to this.

*Hussey:* If the indictment be good in law, then he will be tried guilty or not guilty by the neighbourhood where he was indicted, because they have the power to find him guilty or not guilty, in as much as it is all one reasoning. Query if a felony be done in Middlesex and one J. receives the felon in another county, if he will be indicted as an accessory. And see Hillary 11 Henry IV folio 54 for a case of trespass of menace of a man's servants, whereby he lost

their services in another county and the counties
could not join, because the defendant pleded not
guilty *there,* and therefore the plaintiff took nothing
by his writ. And there was an adjournment. See
Michaelmas 6 Henry VII folio 9.

*APPENDIX II — Digest of American Cases*

*ALABAMA:* *Green* v *State,* 66 Ala 40; 41 Am Rep
    744 (1880). Blow in Alabama, death in Georgia.
    Statutory jurisdiction for offenses "commenced
    here—consummated without". Summing up
    common law, the Court said:
    "The better opinion seems to have been, how-
    ever, that the jurisdiction attached in the *venue*
    where the blow was inflicted." *Id,* 44.
    Although statute upheld, the Court rested its
    decision on common law, citing especially *Rex*
    v *Hargrave, supra,* p 311:
    "We need not rest the decision of this ques-
    tion, however, on this particular construction
    of the statute. Our view is, that the crime of
    murder consists in the *infliction of a fatal
    wound,* coupled with the requisite contem-
    poraneous *intent, or design,* which legally ren-
    ders it felonious. The subsequent *death* of
    the injured party is a *result, or sequence,* rather
    than a constituent, elemental part of the crime.
    This principle is correct, we think, at least so
    far as affects the question of jurisdiction." *Id,*
    45.

*ARKANSAS:* No case on the precise issue, but the
    example of a man firing a gun across a state line
    was given and the Court thought that jurisdic-
    tion would be where the impact occurred. See
    *State* v *Chapin,* 17 Ark 561, 565; 65 Am Dec 452
    (1856). (Dicta.)

CALIFORNIA: People v Gill, 6 Cal 637, 638 (1856). Defendant indicted for murder. After blow but but before death the legislature amended statute and a conviction was had under the amended law. On review the Court held the crime to be committed at the date of the blow and governed by law then in force.

FLORIDA: Roberson v State, 42 Fla 212; 28 So 427 (1900). Indictment failed to show in what state or county the victim died. State constitution guaranteed trial in county where offense "committed". Statute for offenses "commenced within—consummated without". On the question of jurisdiction the Court upheld the statute and also found the offense "committed" in Florida under common-law principles:

"The true view probably is that at common law the offence was committed where the mortal wound was inflicted and the crime was complete there so far as the defendant was concerned. Death must result within a year and a day from the wound in order to constitute murder, but when it does result within that time it relates back to the fatal beginning as a direct sequence of it." Id, 215–216.

GEORGIA: Simpson v State, 92 Ga 41; 17 SE 984 (1893). Shot across state line into Georgia but bullet lodged in a tree instead of the intended victim. The Court said that had the bullet hit, there would have been no question of Georgia jurisdiction for murder, citing Bishop and other authorities for the proposition that "[t]he law deems that a crime is committed in the place where the criminal act takes effect." Id, 42. Although the defendant was convicted of an assault under a theory of his "constructive

presence" in Georgia with his bullet (the "leaden messenger"), the Court seems to adopt a rule of "impact" for determining homicide jurisdiction.

*ILLINOIS: Kirkham* v *People,* 170 Ill 9, 12; 48 NE 465 (1897). Blow in Illinois, death in Indiana. The indictment averred the deceased died from wounds inflicted in Illinois but did not aver that the death occurred in Indiana. In holding the averment of place of death unnecessary the Court said:

"The place where the blow was inflicted is the place where the crime was committed, and it is wholly immaterial to what points the injured man wandered or was removed, or the extent to which he changed his place of residence, or where he died. The place of the offense is the one fact to be proven with reference to place, and the fact of death only determines the character of the crime, and relates back to that act and gives quality and fixes the character of the offense." 170 Ill 9, 12.

*INDIANA: Archer* v *State,* 106 Ind 426; 7 NE 225 (1886). Assault and kidnapping in one county, further assault and death in another. Indictment in first county. Although there was an "either county" statute covering the situation the Court said:

"The acts done by the appellant and his associates were, we repeat, part of the crime; they were material, and they were substantial wrongs, so that it would seem that, *even at common law,* jurisdiction would vest in the county where those acts were committed." *Id,* 429. (Emphasis added.)

*KANSAS: State* v *Bowen,* 16 Kan 475 (1876). Blow in Kansas but no allegation as to place

of death. Statute provided for trial in county
of blow where death within state but no statute
as to death without state. The possibility that
death ensued without Kansas was held not to
render jurisdiction under the indictment defec-
tive and after reviewing the common law the
Court concluded:

"It seems to us, without pursuing the author-
ities further, reasonable to hold that as the only
act which the defendant does toward causing
the death is in giving the fatal blow, the place
where he does that is the place where *he com-
mits the crime,* and that the subsequent wander-
ings of the injured party, uninfluenced by the
defendant, do not give an ambulatory character
to the crime; at least, that those movements do
not, unless under express warrant of the statute,
change the place of offense; and that while it
may be true that the crime is not completed until
death, yet that the death simply determines the
character of the crime committed in giving the
blow, and refers back to and qualifies that act."
16 Kan 475, 479. (Emphasis in original.)

*KENTUCKY: Commonwealth* v *Apkins,* 148 Ky
207; 146 SW 431 (1912). Poison administered
in Ohio, death in Kentucky. In holding the
Kentucky courts had no jurisdiction under
common law, the Court reviewed English and
American authorities and concluded as follows:

"Thus, it appears that, not only at the com-
mon law, but in States where the question of
jurisdiction is regulated by statute, courts have
with a degree of uniformity held that the crime
is committed at the place where the act is done
which results in the injury or death, and that
the prosecution for such act is properly conduct-

ed at the place where the act is done, and not where the death may occur." 148 Ky 207, 212.

See also *Commonwealth* v *Ball,* 126 Ky 542, 545; 104 SW 325 (1907). Blow in Kentucky, death in Tennessee. The common law held to be that the state in which the mortal wound was given has jurisdiction in cases of homicide across state lines. Citing *Rex* v *Hargrave, supra,* Roberson on Criminal Law, § 214; 1 Bishop on Criminal Law, § 113.

*LOUISIANA:* State v *McCoy,* 8 Rob (La) 545; 41 Am Dec 301 (1844). Blow in Louisiana, death in Mississippi. The Court cited Hale and Hawkins for the rule that the more common opinion was that jurisdiction could be had at the place of the stroke and held the statute of 2 George II, c. 31, § 8 (providing "when the stroke has been given in England and the death occurs out of England, or the reverse, that the killing may be inquired of in that part of England where either the death or stroke shall happen respectively") to be explanatory of the common law and part of the common law of Louisiana. 8 Rob (La) 545, 548.

*MAINE:* State v *Kelly,* 76 Me 331; 49 Am Rep 620 (1884). Blow in United States fort and death outside fort in State of Maine. Federal statute punished murders "committed within any fort, arsenal, etc". (Same statute as in *Guiteau, supra,* p 16.) Maine statute gave jurisdiction when death ensued from a blow on "high seas, or without the state". (*Tyler II* statute, MCLA 762.6). The Court held the Maine statute inapplicable because of paramount power of congress to punish crimes "committed" within United States forts and said:

"The modern and more rational view is that the crime is committed where the unlawful act is done, and that the subsequent death, while it may be sufficient to confer jurisdiction, (assuming some special statute) can not change the locality of the crime." 76 Me 331, 334.

*MARYLAND: Stout v State,* 76 Md 317; 25 A 299 (1892). Blow in Maryland, death in Pennsylvania. "County of blow" statute governed only cases of blow and death both within the state but the Court, quoting Hale with approval, said the same common law principle governs the case where death ensues outside the state. (Discussed in text, *supra,* p 322.)

See also *Kelley v State,* 181 Md 642; 31 A2d 614 (1943). Blow in Maryland, death in District of Columbia. Same result as *Stout,* citing Hale and 1 Stephens, History of the Criminal Law of England, p 276, as well as authorities reviewed in *Stout.*

*MASSACHUSETTS: Commonwealth v Macloon,* 101 Mass 1; 100 Am Dec 89 (1869). Blow on high seas, death in Massachusetts. At issue was the validity of a statute like that in *Tyler II, supra,* conferring jurisdiction in such a case. In upholding the statute the Court sought to distinguish Justice CAMPBELL's dissent in *Tyler II.* The dicta suggesting that jurisdiction may not be at the place of the blow as between states relies on Lord Coke and fails to recognize other cases and authorities.

*MINNESOTA: State v Gessert,* 21 Minn 369 (1875). An indictment charged murder by a blow in Minnesota, death in Wisconsin. The question was whether the indictment charged

the commission of murder in the county of Washington. Citing East, Bishop and other authorities the Court said:

"It is for his acts that defendant is responsible. They constitute his offence. The place where they are committed, must be the place where his offence is committed, and therefore the place where he should be indicted and tried. * * * The death which ensued in Pierce county, though it went to characterize the acts committed in Washington county, was not an act of defendant, committed in Wisconsin, but the consequence of his acts committed in Washington county, against the peace and dignity of the State of Minnesota."

See also *State v Smith,* 78 Minn 362; 81 NW 17 (1899). Same facts, reasons and result.

*MISSOURI:　State* v *Blunt,* 110 Mo 322; 19 SW 650 (1892). Blow in one county, death in another within the state. Indictment brought in county of blow under "either county" statute. A constitutional provision required prosecution where the offense was "committed." To the objection that the offense was "committed" where death ensued the Court said:

"Hence, in this case, there can be no doubt as to the indictment having been found in the proper county, the county where the offense was committed, the blow given, and the circuit court of that county had, therefore, jurisdiction, and the indictment is, therefore, not obnoxious to the objection now being discussed."

See also *State* v *Garrison,* 147 Mo 548; 49 SW 508 (1898). Blow in Missouri, death in Kansas. State where the blow is given has jurisdiction

under the common law, citing American cases construing English common law.

*NEBRASKA: Debney* v *State,* 45 Neb 856; 64 NW 446 (1895). Between the blow and the death the legislature passed new statutes which if applicable to the crime would mitigate the seriousness of the offense. The Court said it was unnecessary to determine when the statute went into effect since the prior statute was in force at the time of the wounding and said:

> "Undoubtedly the concurrence of both the wounds and the consequent death were necessary for the consummation of the crime of murder, for until death ensues the crime is not complete. * * * The great weight of the decisions hold that, independent of any statutory provision upon the subject, the crime is committed, and is punishable in the jurisdiction, where the fatal wound or blow is given. In other words, that it is not the place of the death, but the place where the criminal act is perpetrated to which the jurisdiction to try and punish is given. It was the inflicting of the fatal wounds by the prisoner, coupled with the requisite contemporaneous intent or design, which constituted the felony, the subsequent death of Mrs. Debney being a result or consequence rather than a constituent element of the offense." 45 Neb 856, 859–860. (See also *People* v *Gill, supra,* p 338.)

*NEW JERSEY: State* v *Carter,* 27 NJL 499 (1859). Blow in New York, death in New Jersey. The Court denied jurisdiction to the courts of New Jersey since the crime was "committed" in New York. (Discussed in text, *supra,* p 322.)

See also *Hunter* v *State,* 40 NJL 495 (1878).
Blow in New Jersey, death in Pennsylvania. A
statute modeled after 2 George II, c. 31 provid-
ing for jurisdiction in such cases was upheld
and the Court interpreted the common law as
providing jurisdiction where the blow was given
absent the statute. 40 NJL 495, 522–549.

*NEW MEXICO: State* v *Montes,* 22 NM 530; 165
    P 797 (1917). The Court held that an allega-
    tion of place of death in an indictment for
    homicide was unnecessary because the common
    law rule was that trial may be had at the place
    of the blow. 22 NM 530, 534.

*NORTH CAROLINA: State* v *Hall,* 114 NC 909; 19
    SE 602 (1894). Defendant standing in North
    Carolina shot across the state line killing a
    man in Tennessee. In holding the courts of
    North Carolina had no jurisdiction to try for
    murder the Court reviewed the common law
    authorities and said:

    "In view of the foregoing authorities it cannot
    be doubted that the place of the assault or stroke
    in the present case was in Tennessee, and it is
    also clear that the offence of murder at common
    law was committed within the jurisdiction of
    that State." 114 NC 909, 917.

*OHIO: Robbins* v *State,* 8 Ohio St 131 (1857). The
    accused gave poison to the deceased in one coun-
    ty and it was taken to another county where she
    swallowed it, became poisoned and died. The
    issue was where the administering of the poison
    took place under a statute giving jurisdiction
    to the county where the mortal blow or poison
    was administered. Although not directly on
    point the Court focused on the actual ingesting

of the poison and localized the event where the effect of the criminal agent began. In the opinion the Court cited the example at issue in *State v Hall, supra,* and noted that where the gun would be shot across the county line jurisdiction would be where the impact occurred. 8 Ohio St 131, 166.

*OKLAHOMA: Albright v Territory,* 11 Okla 497; 69 P 789 (1902). The indictment failed to allege the place of death but the Court said:

"A person charged with the commission of the crime of murder must be indicted and tried in the county where the injury which caused the death was inflicted, and it is not necessary to allege the place of death." *Id,* 497.

*Moran v Territory,* 14 Okla 544; 78 P 111 (1904). Indictment charged shooting and death in Oklahoma Territory but facts showed shooting in Oklahoma Territory and death in Indian Territory.

"The crime was committed when the fatal shot was fired and the mortal wound inflicted in Comanche county, Oklahoma Territory, and the death which occurred in the Indian Territory merely determined the character of the crime, and only referred back to and qualified the homicidal act. It follows that the jurisdiction of the crime was properly laid in Oklahoma, and not in the Indian Territory." 14 Okla 544, 551.

*PENNSYLVANIA: Commonwealth v Bingaman,* 51 Pa Sup Ct 336 (1912). Abortion prosecution presented the issue of where the crime was "committed" and it was held that crime was committed where the instruments were used and not where the fetus was delivered.

*TENNESSEE:*  *Riley* v *State,* 28 Tenn (9 Humph)
646 (1849).  An indictment alleged the place of
blow and death was in Henderson County but
there was no proof as to the actual place of
death.  In holding this was not material the
Court said as to the common law and the mean-
ing of the word "committed":

"We find no decision in which it had been held
that the murderer, in such case, could be indicted
in neither county.  On the contrary, East says,
the common opinion was, that he might be in-
dicted where the stroke was given.  That alone,
is the act of the party.  He commits this act,
and the death is only a consequence.  Therefore,
when the Legislature enact that the party shall
be tried in the county where the offence may
have been committed, they intended where the
active agency of the perpetrator was employed."
28 Tenn 646, 658.

*VIRGINIA:*  *Commonwealth* v *Linton,* 2 Va Cr Cas
205 (1820).  Blow in Virginia, death in Ohio.
The Court held the defendant could only be tried
for assault and not for murder as the death
occurred outside the state.  The case is criticized
by Bishop (quoted in text, *supra,* p 325) and the
opinion cites no authority, common law or other-
wise, for its conclusion.

*WASHINGTON:*  *State* v *Baldwin,* 15 Wash 15; 45
P 650 (1896).  The place of the blow was alleged
in the information but place of death was not
alleged.  In holding that the allegation was
unnecessary to a finding of jurisdiction the
Court said:

"(Our statute), provides for the trial of all
criminal actions in the county where the offence
was committed, and this offence was committed

in Skagit County, regardless of the time or place of death of the deceased." 15 Wash 15, 17.

*WEST VIRGINIA: Ex Parte McNeeley,* 36 W Va 84; 14 SE 436 (1892). Blow in Kentucky, death in West Virginia. The issue was the validity of a statute like the Michigan statute (*Tyler II*) providing for jurisdiction in the state where death occurred. In upholding the statute the Court discussed the question of whether absent statute the offense was committed in a legal point of view in Kentucky where the blow was given or in West Virginia where the death occurred. After a lengthy review of the common law and a discussion of the statute of 2 and 3 Edward VI, c. 24, the Court concluded:

" 'This statute has been held to be part of the common-law in several States in this country; *but even where it is in force it does not, according to the better opinion, divest the jurisdiction of the place where the blow was struck.'* 1 Bish. Crim. Proc. § 52. I think the proposition that the prosecution may be where the blow is given, no matter where the death, was the rule under the ancient common-law, and certainly under the modern common-law as held in American courts. *The true view is that the blow is murder or not, according as it produces death or not within a year and a day; and in all cases an indictment lies in the county where the blow was given."* 36 W Va 84, 88. (Emphasis added.)

*WISCONSIN: State* v *Pauley,* 12 Wis 537 (1860). Blow in one county, death in another. "Either county" statute applied and in a brief discussion of the common law the Court agreed with Lord Coke's position on the absence of authority to proceed absent a statute.

## APPENDIX III

## TRANSCRIPT OF ARRAIGNMENT
(Filed June 5, 1967)

At a session of said Court, held in the Courthouse in the Village of Cassopolis, State of Michigan, on the 25th day of May, 1967, before Honorable DAVID ANDERSON, Jr., Circuit Judge.

## ARRAIGNMENT

APPEARANCES:

*Mr. Jerry J. O'Connor,* on behalf of the People; *Mr. Robert Waterson,* on behalf of the Respondent.

*Mr. O'Connor:* If it please the Court, the People versus Ronald Duffield. Mr. Duffield is in Court represented by Attorney Robert Waterson.

(Information read in open Court.)

*Mr. O'Connor:* Mr. Duffield, I have handed you and your attorney a copy of the information. I call your attention to the back of the information where in addition to witness, we have given you notice of a statement to be used in the prosecution against you. It is a statement which was taken by a person acting in cooperation with the law enforcement officers, and the prosecution intends to use said statement.

*The Court:* You are Ronald Duffield?

*Respondent:* Yes, sir.

*The Court:* You are how old, Mr. Duffield?

*Respondent:* Twenty-three.

*The Court:* Can you read and write?

*Respondent:* Yes.

*The Court:* The information in this case charges you with the offense of manslaughter, which is the unintentional but unlawful taking of a human life. This is a felony. It is punishable by a maximum term of imprisonment of fifteen years in the State

Penitentiary. Now, do you understand what you are charged with today?

*Respondent:* Yes.

*The Court:* You are represented by Mr. Waterson, your attorney. Have you had a chance to consult with your lawyer concerning this matter?

*Respondent:* Yes.

*The Court:* You understand that you are entitled to have the truth of the charge determined in a trial either before a jury or before the Court without a jury and that your guilt would have to be established beyond a reasonable doubt before you could be convicted?

*Respondent:* Yes.

*The Court:* Now, what is your plea to this charge?

*Respondent:* Guilty.

*The Court:* You understand that by entering a plea of guilty to this charge, you are waiving the trial that we speak of?

*Respondent:* Yes.

*The Court:* And that all that will remain will be a presentence investigation and then the imposition of sentence?

*Respondent:* Yes.

*The Court:* Now, are you in jail at this time?

*Respondent:* Yes.

*The Court:* How long have you been in jail?

*Respondent:* Ever since May 1st.

*The Court:* Since May 1st?

*Respondent:* Yes.

*The Court:* While you have been in jail, have you been treated properly by the officers?

*Respondent:* Yes.

*The Court:* No one has made any threats against you?

*Respondent:* No.

*The Court:* Or put any improper pressure on you to get you to plead guilty?

*Respondent:* No.

*The Court:* Has anyone promised you a light sentence if you entered a plea of guilty?

*Respondent:* No.

*The Court:* Now, it is charged in this information that on or about the 29th day of April, you assaulted John Henry Frazier, and inflicted injuries from which he died. Tell me in your own words just what happened.

*Respondent:* To be truthful with you, I don't exactly know what happened. I was drinking.

*The Court:* Well, you know you were out there, don't you?

*Respondent:* Yes, I know that I was there. Yes.

*The Court:* And you know you got in a fight with Frazier?

*Respondent:* Yes.

*The Court:* Do you know whether or not you used any weapon?

*Respondent:* I don't think I did.

*The Court:* You think you beat him with your fist or something of this kind?

*Respondent:* Yeah. I don't think I used anything, though.

*The Court:* What did you get into a fight with him about?

*Respondent:* I don't know that, either.

*The Court:* Was there some money involved?

*Respondent:* At one time—they didn't bring it up in Court, so I don't know.

*Mr. O'Connor:* May I ask a couple of questions, your Honor?

*The Court:* Yes.

*Mr. O'Connor:* Mr. Duffield, you will recall John Henry Frazier owed you a dollar?

*Respondent:* I guess so.

*Mr. O'Connor:* Well, he owed you a dollar, and he gave you fifty cents, leaving fifty cents still due.

*Respondent:* He only owed me fifty cents.

*Mr. O'Connor:* He only owed you fifty cents, you say, and the reason you went out to his house was to get that fifty cents?

*Respondent:* I don't know.

*The Court:* Well, you remember that you had him down on the floor and you were hitting him with your fists? You remember that?

*Respondent:* I remember that part, yes.

*Mr. O'Connor:* Do you remember hitting him on the side of the head over the eyes, right in that area, with your fists?

*Respondent:* I don't know exactly where I hit him at, no.

*Mr. O'Connor:* Then you left and you went down the street?

*Respondent:* Yes.

*Mr. O'Connor:* And at that time you did leave, he was lying there on the floor?

*Respondent:* Yeah, that is what I heard.

*Mr. O'Connor:* Well, you do know this, too, don't you?

*Respondent:* No, I can't remember.

*Mr. O'Connor:* You don't remember?

*Respondent:* No, I can't.

*Mr. O'Connor:* But you do remember hitting him?

*Respondent:* Yes.

*Mr. O'Connor:* All right. And nothing happened the next day, until the next day, did it?

*Respondent:* No.

*Mr. O'Connor:* What happened the next day?

*Respondent:* They took him to the hospital the next day.

*Mr. O'Connor:* And you knew his sister had taken him to the hospital?

*Respondent:* Yes.

*Mr. O'Connor:* And you never did get your fifty cents from him, did you?

*Respondent:* No.

*The Court:* How old was Mr. Frazier?

*Respondent:* Fifty some years old.

*The Court:* How big a man is he?

*Respondent:* Not very big.

*The Court:* Not very big?

*Respondent:* No.

*The Court:* Well, you don't have any doubt in your mind but what you are guilty of this offense, do you?

*Respondent:* No, I don't have any doubt.

*The Court:* All right. I am satisfied that your plea of guilty to this charge is made freely and voluntarily, that it is not the result of any threats nor undue influence, nor the result of any promise of leniency, and your plea of guilty will be accepted. You will be remanded to the custody of the sheriff until you are required to appear for sentence.

*Mr. O'Connor:* Thank you.

BLACK, J. (*concurring*). I find myself in agreement with the conclusions reached by Division 3 (20 Mich App 473, 480–481) in the last 2 paragraphs of its opinion and therefore vote to affirm.

T. G. KAVANAGH, J. (*dissenting in part*). I agree with my Brother WILLIAMS that the circuit court for Cass County had jurisdiction to try the defendant for the crime of manslaughter for the reasons he so well sets forth.

I do not agree however that the proffered plea of guilty should have been accepted.

In my view, when a person cannot recall his actions constituting the commission of the offense with which he is charged, he cannot plead guilty, for there is no basis for the judgment of his own guilt.

There should be no question of a guilty plea. The tenor of the statute is that *doubts* should be resolved against taking the plea.

When the defendant here told the court he was so drunk he did not remember what he did, the court should have rejected the plea even though defendant's intoxication would be no defense at a trial.

I would remand for trial.