921 P.2d 1266

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Tony CAMPOS, Defendant–Appellant.**

No. 21429.

Supreme Court of New Mexico.

May 30, 1996.

Rehearing Denied July 24, 1996.

T. Glenn Ellington, Chief Public Defender, Christopher Bulman, Assistant Appellate Defender, Amme M. Hogan, Assistant Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FROST, Chief Justice.

1. Defendant–Appellant Tony Campos appeals his convictions for first-degree criminal sexual penetration (CSP) and first-degree felony murder. He raises three contentions on appeal: (1) that intoxication should serve as a defense to felony murder; (2) that he was denied his constitutional right to confront one of the witnesses; and (3) that his conviction and sentencing for both first-degree CSP and first-degree felony murder violated constitutional protections against double jeopardy. We affirm on the first two issues, reverse on the third, and remand.

## I. FACTS

2. Campos and his friend Victor Gutierrez began drinking beer on the afternoon of June 12, 1992. Gutierrez was a learning-disabled 24–year–old, who generally was submissive to Campos's more aggressive personality. On the evening of June 12, the two went to the home of Lisa Salcido and her boyfriend, Bernie Baca, and drank whiskey as well as beer. At one point during the late evening, Gutierrez, who could not drive, asked Campos to take him home, but Campos refused and ordered him to continue drinking.

3. During the course of the evening, Campos and Gutierrez began engaging in horseplay with sexual overtones. Sometime after 2:00 a.m. the two men went outside, and Campos took off Gutierrez's clothing. They reentered the house and Gutierrez began acting like a dog; someone commented that Gutierrez needed a tail. Salcido and Baca went to bed, leaving Salcido's nephew to sleep in the living room. Campos and Gutierrez went back outside. Gutierrez wanted to go home and began walking naked down the street. He fell down, and Campos helped him up, brought him back to the front yard, and laid him on the ground.

4. Campos then went to the front door of Salcido's house and asked Salcido's nephew for a broom. When the nephew refused to get one, Campos walked around the house to the back porch and got a mop. He returned to the front yard, held Gutierrez down, and began thrusting the mop into Gutierrez's anus, handle first. Campos twice thrust

nearly the entire length of the mop handle into Gutierrez's anus. He used such force on these two thrusts that on its first path the mop penetrated Gutierrez's intestine, his liver, his diaphragm, and the pericardial sac of his heart. The second thrust penetrated his diaphragm, injured his lung, and ended by bulging the skin near his shoulder. Campos did not withdraw the mop after this second forcible insertion.

5. Salcido, who was still inside the house, heard Gutierrez moaning, saying no, and crying out in pain. She then heard Campos laughing and yelling for everyone to "come look at this." Baca looked out the window, saw what Campos had done, and ran next door to call the police. When Campos saw that the police were coming, he got a water hose and began spraying Gutierrez, telling him to get up. When Gutierrez did not get up, Campos ran to the front door and demanded to be let inside. Once inside, he pretended to be asleep on a couch.

6. When police officer Mike Mealand arrived, he found Gutierrez lying in the front yard. Officer Mealand noticed a bulge at Gutierrez's left shoulder and then saw the mop protruding from his anus. Officer Mealand tried to rouse Gutierrez, but Gutierrez only responded with a moan. The officer then called for medical personnel and backup. Another officer arrived at the scene, and he and Mealand went to the front door of the house and spoke to Salcido. Salcido told them she did not know Gutierrez and stated that only she and her two children were inside her house. The paramedics then arrived. They determined that Gutierrez was still awake but incoherent. He later died from the internal injuries inflicted by Campos.

7. A short time after the paramedics took Gutierrez to the hospital, several officers asked Salcido's permission to enter the house, and she let them in. They found Campos asleep on the couch, arrested him on an outstanding warrant, and took him into custody. After a bench trial the court found Campos guilty of first-degree CSP and first-degree felony murder. Campos now appeals his convictions. We note jurisdiction over this appeal pursuant to SCRA 1986, 12–102(A)(2) (Repl.Pamp.1992).

## II. COLLATERAL–FELONY REQUIREMENT

8. Campos first argues that the felony-murder doctrine should not have been applied in his case. He contends that the underlying felony of first-degree CSP was not independent of or collateral to the killing and therefore cannot serve as a predicate felony for felony murder. Campos relies on *State v. Harrison* in which this Court first discussed the collateral-felony doctrine for felony murder.[1] *State v. Harrison*, 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977) (reviewing felony-murder conviction based on false imprisonment followed by a homicide). We noted in *Harrison* that various jurisdictions have placed limitations on the felony-murder doctrine, including the following: "(1) there must be a causal relationship between the felony and the homicide, (2) *the felony must be independent of or collateral to the homicide*, and (3) the felony must be inherently or foreseeably dangerous to human life." *Id.* (emphasis added); *see also, State v. Pierce*, 109 N.M. 596, 601, 788 P.2d 352, 357 (1990) (reaffirming applicability of these limitations in New Mexico). However, *Harrison* did not address the application of the collateral-felo-

1. The collateral-felony doctrine is more commonly referred to as the merger doctrine because the predicate felony and the homicide are said to merge. *See, e.g., People v. Hansen*, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, 1028 (1994) (in bank) ("The name of the [merger] doctrine derived from the characterization of the assault as an offense that 'merged' with the resulting homicide."). However, the term "merger" has been used in other contexts as well, such as referring to a lesser-included offense which is subsumed into the greater offense upon conviction for the latter, or referring, somewhat inaccurately, to double-jeopardy concepts. *See, e.g., State v. Meadors*, 121 N.M. 38, 49 n. 10, 908 P.2d 731, 742 n. 10 (1995) (noting confusion regarding merger); *Swafford v. State*, 112 N.M. 3, 12–13, 810 P.2d 1223, 1232–33 (1991) (discussing merger). Accordingly, we shall use the expression "collateral-felony doctrine" to avoid confusion.

ny doctrine. *Harrison,* 90 N.M. at 441–42, 564 P.2d at 1323–24 (discussing causation and dangerous felony requirements). *But see Pierce,* 109 N.M. at 601, 788 P.2d at 357 (noting kidnapping preceded and was independent of the subsequent killing).

9. The collateral-felony requirement originated in response to concern over the broadening application of the felony-murder doctrine. When the felony-murder doctrine first developed in England, all felonies were punishable by death. *See Harrison,* 90 N.M. at 441, 564 P.2d at 1323 (discussing history of the doctrine). Therefore, it made little difference if the perpetrator were executed for felony murder or for the predicate felony. *Id.* However, as legislatures shifted to a graduated system of punishment for differing felonies, the felony-murder doctrine took on a greater significance. The felony-murder doctrine served to relieve prosecutors of the burden of having to prove malice aforethought when the defendant killed someone while committing a felony. The commonly stated purpose of the felony-murder rule was not to deter the underlying felony, but instead to deter negligent or accidental killings that may occur in the course of committing a felony. *People v. Smith,* 35 Cal.3d 798, 201 Cal.Rptr. 311, 678 P.2d 886, 891 (1984) (in bank); *State v. Lucas,* 243 Kan. 462, 759 P.2d 90, 93 (1988), *aff'd on reh'g,* 244 Kan. 193, 767 P.2d 1308 (1989).

10. However, the vast majority of homicides are predicated on an initial felonious assault or battery of some kind. For example, a homicide involving a shooting could be classified as either second-degree murder or felony murder based on an assault with a deadly weapon. Thus, courts realized that in such cases, application of the felony-murder doctrine would allow for conviction of the defendant for murder without the prosecution having to prove the existence of malice. This, in turn, would eliminate the mens-rea requirement for murder in most homicide cases and circumvent the legislative gradation system for classes of homicides. 1 Paul H. Robinson, *Criminal Law Defenses* § 103(b) (1984). As the California Supreme Court explained:

[T]he utilization of the felony-murder rule in [such circumstances] extends the operation of that rule "beyond any rational function that it is designed to serve." To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law.

*People v. Ireland,* 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, 590 (1969) (in bank) (citation omitted) (quoting *People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130, 134 (1965)). Consequently, courts established the limitation that the predicate felony had to be collateral to or independent of the homicide. *Harrison,* 90 N.M. at 441, 564 P.2d at 1323.

## A. Approaches of Different Jurisdictions

11. The various jurisdictions have developed differing standards for determining whether the predicate felony is collateral or independent. *See generally* 1 Robinson, *supra,* § 103(b) (noting different approaches). Some jurisdictions, such as Kansas, have focused solely on whether the act that caused the homicide was the same as the underlying felonious conduct. *See, e.g., State v. Prouse,* 244 Kan. 292, 767 P.2d 1308, 1313 (1989). The Kansas Supreme Court explained:

"Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule."

The collateral felony must, therefore, be felonious conduct other than the lethal act itself. Thus, a homicide occurring during the commission of an independent felony, such as aggravated robbery, rape, or kidnapping, comes under the felony-murder statute. However, the lethal act itself cannot serve as the independent collateral fel-

ony necessary to support a felony-murder conviction.

*Id.* (citation omitted) (quoting *Lucas,* 759 P.2d at 90 (syllabus language)); *see also Garrett v. State,* 573 S.W.2d 543, 545 (Tex. Crim.App.1978) (noting that, for felony-murder doctrine to apply, there must be felonious conduct other than the act causing death).

12.  Other jurisdictions focus on the defendant's underlying purpose in committing the predicate felony. *See, e.g., People v. Mattison,* 4 Cal.3d 177, 93 Cal.Rptr. 185, 481 P.2d 193, 198 (1971) (in bank); *People v. Moran,* 246 N.Y. 100, 158 N.E. 35, 36 (1927). In *Mattison,* the California Supreme Court held that the same act could serve as the basis for both the homicide and the predicate felony so long as the predicate felony was committed with a collateral or independent felonious design. *Mattison,* 93 Cal.Rptr. 185, 481 P.2d at 198 (quoting *People v. Taylor,* 11 Cal.App.3d 57, 89 Cal.Rptr. 697, 699, *hearing denied,* (Oct. 28, 1970)). Under this approach, if a defendant committed burglary with the intent of assaulting the occupant of the home and actually killed the occupant, the felony of burglary could not serve as a predicate felony for felony murder because it was not committed with a felonious design that was collateral to the homicide. However, the opposite conclusion would be true if the burglary were committed with the intent of robbing the occupant but resulted in a homicide. *Cf. Taylor,* 89 Cal.Rptr. at 701–02 (discussing felony murder and burglary).

13.  However, in *People v. Hansen,* the California Supreme Court recently departed from this collateral felonious-design test, focusing instead on whether allowing the particular felony to serve as a predicate felony for applying the felony-murder doctrine would subvert legislative intent regarding the mens-rea requirements of the murder statutes. *People v. Hansen,* 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, 1030–31 (1994) (in bank) (concluding that felony of willful discharge of a firearm at inhabited house could serve as predicate felony for felony murder when the shooting killed an occupant).

14.  Arizona has followed yet another approach. Arizona's felony-murder statute specifically enumerates certain felonies for which a resulting homicide will be deemed first-degree murder. *See State v. Miniefield,* 110 Ariz. 599, 522 P.2d 25, 28 (1974) (en banc). Accordingly, in applying the felony-murder doctrine, the Arizona courts only look to see if the predicate felony is enumerated in the statute, regardless of whether the underlying act was unitary or if there was only a single purpose. *Id.* (holding that arson resulting in death constituted felony murder even though the same act was the basis for both the predicate felony and the homicide, and even though the defendant's design was to use the act of arson to commit a homicide). The New Mexico felony-murder statute, however, does not enumerate possible predicate felonies. NMSA 1978, § 30–2–1(A)(2) (Repl.Pamp.1994).

## B.  The Proper Approach For New Mexico

15.  Campos urges us to follow the Kansas approach and hold that the collateral-felony requirement mandates that the underlying felonious act must be temporally or spatially distinct from the lethal act. Campos points out that, in this case, the act of criminal sexual penetration with a mop was the very same act that caused Gutierrez's death. He therefore argues that the CSP cannot serve as the predicate felony for applying the felony-murder doctrine. However, we decline to follow the Kansas approach or the other two approaches discussed above.

16.  New Mexico has a distinct version of the felony-murder doctrine, which calls for a different formulation of the collateral-felony requirement. The primary distinction between New Mexico's felony-murder doctrine and those of other jurisdictions is that, in *State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991), this Court imposed a mens rea requirement for felony murder. *Compare Ortega,* 112 N.M. at 563, 817 P.2d at 1205 (requiring showing of mens rea for sec-

ond-degree murder to elevate the murder to first-degree felony murder) *with Miniefield,* 522 P.2d at 28 ("The legislature has deemed ... murder committed in the perpetration of certain other felonies so heinous and committed with such a wanton disregard for human life that there is no need to prove the elements usually necessary for a conviction for first degree murder.") *and Mattison,* 481 P.2d at 198 (noting with respect to second-degree felony murder, "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (quotations omitted)) *and State v. Branch,* 244 Or. 97, 415 P.2d 766, 767 (Or. 1966) (en banc) ("The purpose of the felony-murder rule is to relieve the State of the burden of proving premeditation or malice whenever the victim's death is caused by the killer while the killer is committing another felony.").

■ 17. We explained in *Ortega* that the felony-murder doctrine in New Mexico does not abandon the mens rea requirement for murder, nor does it create a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony. *Ortega,* 112 N.M. at 563, 817 P.2d at 1205. Our felony-murder rule only serves to raise second-degree murder to first-degree murder when the murder is committed in the course of a dangerous felony. *Id.*

18. Accordingly, unlike other jurisdictions, New Mexico's modernized felony-murder doctrine does not run the risk of circumventing the legislatively determined mens rea for murder. Furthermore, the purpose of the felony-murder rule as explained in Kansas and California—to deter negligent or accidental killings that may occur in the course of committing a felony—is inapposite in New Mexico, because a negligent or accidental killing would not constitute second-degree murder and would therefore not implicate the felony-murder doctrine. Rather, this Court explained that the purpose of the felony-murder rule in New Mexico is to elevate second-degree murder to first-degree

murder "when it occurs in circumstances that the legislature has determined are so serious as to merit increased punishment." *Id.* We noted in *Harrison* that these serious circumstances include the commission of a first-degree felony or a lesser-degree felony that is itself inherently dangerous or is committed under circumstances that are inherently dangerous. *Harrison,* 90 N.M. at 442, 564 P.2d at 1324.

■ 19. Therefore, because the killing must already constitute second-degree murder for the felony-murder doctrine to apply, the main concern in applying the felony-murder doctrine in New Mexico is that the prosecution may be able to elevate improperly the vast majority of second-degree murders to first-degree murders by charging the underlying assaultive act as a predicate felony for the felony-murder doctrine. Consequently, the appropriate limitation imposed by the collateral-felony doctrine in New Mexico is simply that the predicate felony cannot be a lesser-included offense of second-degree murder. *See* 1 Robinson, *supra,* § 103(b), at 498 ("An approach [to the collateral-felony doctrine] more consistent with modern offense definitions might be to merge all felonies that are lesser included offenses of the [second-degree] murder statute."); *cf. State v. Essman,* 98 Ariz. 228, 403 P.2d 540, 545 (1965) (en banc) ("The felony-murder doctrine does not apply where the felony is an offense included in the charge of homicide.").

## C. What is a Lesser–Included Offense Under the Collateral–Felony Rule

20. Having determined that the predicate felony cannot be a lesser-included offense of second-degree murder, we are still left with the question of what constitutes a lesser-included offense for purposes of applying the collateral-felony rule. *See, e.g., State v. Meadors,* 121 N.M. 38, 41–42, 908 P.2d 731, 734–35 (1995) (noting different approaches to question of what constitutes lesser-included offense); *Swafford v. State,* 112 N.M. 3, 10–13, 810 P.2d 1223, 1230–1233 (1991) (same). In *Meadors* we explained that New Mexico

follows two distinct approaches for analyzing whether one crime constitutes a lesser-included offense of another. *Meadors*, 121 N.M. at 41–44, 908 P.2d at 734–37. The first approach is the strict-elements test, which generally applies in the double jeopardy context. We noted:

> Under [the strict-elements test], a court would find an offense to be a lesser-included offense of another only if the statutory elements of the lesser offense are a sub-set of the statutory elements of the greater offense such that it would be impossible ever to commit the greater offense without also committing the lesser offense.

*State v. Meadors*, 121 N.M. at 42, 908 P.2d at 735; *see also Swafford*, 112 N.M. at 8–9, 810 P.2d at 1228–29 (setting out strict-elements test in double-jeopardy analysis (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932))); *State v. Garcia*, 114 N.M. 269, 273, 837 P.2d 862, 866 (1992) ("A lesser included offense is one that includes some, but not all, of the elements of a greater offense and that does not have any element not included in the greater offense, so that it is impossible to commit the greater offense without necessarily committing the lesser offense."). The *Swafford* Court explained that this test provides a tool for inferring whether the "legislature intended to authorize separate application of each [criminal] statute." *Swafford*, 112 N.M. at 9, 810 P.2d at 1229.

**21.** The second lesser-included offense test is the *DeMary* test, which is applicable when a prosecutor requests that the court instruct the jury on a crime not explicitly set out in the charging instrument. *Meadors*, 121 N.M. at 42–43, 908 P.2d at 735–36 (applying *State v. DeMary*, 99 N.M. 177, 179, 655 P.2d 1021, 1023 (1982)). The *DeMary* test is designed to safeguard the defendant's constitutional right to notice of the crimes against which he or she must defend. The *DeMary* test requires that only those crimes for which the elements are sufficiently described in the charging document, and for which supporting evidence is adduced at trial, are presented to the jury as lesser-included offenses. *Id.* at 44, 908 P.2d at 737.[2]

**22.** The strict-elements test, rather than the *DeMary* test, is applicable to the collateral-felony rule. As we explained above, the purpose of the collateral-felony limitation to the felony-murder doctrine is to further the legislative intent of holding certain second-degree murders to be more culpable when effected during the commission of a felony—thereby elevating them to first-degree murders—while maintaining the important distinction between the classes of second- and first-degree murders. Accordingly, because the strict-elements test provides a tool for inferring the legislative intent regarding the application of the criminal statutes, we conclude it is the appropriate method for evaluating whether the underlying felony constitutes a lesser-included offense of second-degree murder for purposes of the collateral-felony doctrine.[3]

**23.** Furthermore, in those situations in which there is more than one statutory definition of the requisite dangerous felony, a question may arise regarding which of the alternative statutory definitions is applicable for purposes of collateral-felony analysis. This question arose in a different context in *Meadors*, 121 N.M. at 49–52, 908 P.2d at 742–45, and also in *State v. Rodriguez*, 113 N.M. 767, 833 P.2d 244 (Ct.App.), *cert. denied*, 113 N.M. 636, 830 P.2d 553 (1992). In

---

**2.** For parity considerations, this test is also applicable when the defendant requests a lesser-included offense instruction. *Meadors*, 121 N.M. at 46–47, 908 P.2d at 739–40.

**3.** We note that this analysis, although similar to a double-jeopardy analysis, differs from a double-jeopardy analysis in that we are looking to whether the predicate felony is a lesser-included offense of *second-degree murder* not *first-degree*

felony murder. *See State v. Contreras*, 120 N.M. 486, 490–92, 903 P.2d 228, 232–34 (1995) (discussing double jeopardy and felony murder). In addition, we are not examining whether the defendant may be punished separately for felony murder and for the predicate felony; rather we are determining if the felony-murder doctrine applies at all.

such a situation, the correct inquiry is whether it is possible to commit second degree murder without committing *some form* of the dangerous felony. For example, it is impossible to commit second degree murder without committing some form of both aggravated assault and aggravated battery. Thus, both of those offenses would always be deemed to be non-collateral even though, under some statutory definitions, aggravated battery and aggravated assault include one or more statutory elements that are not elements of second degree murder. We note that this approach is distinct from the approach taken with respect to the double-jeopardy analysis used in *Meadors* and *Rodriguez,* in which the courts held that it was necessary to refer to the facts of the particular case in order to ascertain the statutory elements of the offense for purposes of double jeopardy analysis.

■ 24. Turning to the case before us, the predicate felony that elevated Campos's charge to felony murder was first-degree CSP. The CSP statute, NMSA 1978, § 30–9–11 (Repl.Pamp.1994), provides in relevant part:

A. Criminal sexual penetration is the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission.

B. Criminal sexual penetration does not include medically indicated procedures.

C. Criminal sexual penetration in the first degree consists of all sexual penetration perpetrated:

(1) on a child under thirteen years of age; or

(2) by the use of force or coercion that results in great bodily harm or great mental anguish to the victim.

Our second-degree murder statute, NMSA 1978, § 30–2–1(B) (Repl.Pamp.1994), provides in relevant part:

B. Unless he is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

25. Applying the strict-elements test to these two statutes, we conclude that first-degree CSP is not a lesser-included offense of second-degree murder. The statutory elements of first-degree CSP are not a sub-set of the statutory elements of second-degree murder but instead contain distinct requirements, and it is certainly possible to commit murder without necessarily committing first-degree CSP. *See Meadors,* 121 N.M. at 42, 908 P.2d at 735 (applying strict-elements test; *Garcia,* 114 N.M. at 273, 837 P.2d at 866 (same)). CSP requires engaging in one of the specified acts or some form of penetration of the genital or anal openings of another, § 30–9–11(A), which are not elements of second-degree murder, § 30–2–1(B). Similarly, the second-degree murder statute requires that the defendant know that his or her acts create a strong probability of death or great bodily harm, § 30–2–1(B), whereas the CSP statute does not contain a similar mens rea with respect to the result of great bodily harm or great mental anguish to the victim, § 30–9–11(C)(2). *Cf. State v. Pierce,* 110 N.M. 76, 80–81, 792 P.2d 408, 412–13 (1990) (noting CSP is distinguishable offense from battery and homicide). Accordingly, we conclude that first-degree CSP properly served as a predicate felony for applying the felony-murder doctrine.

### III. INTOXICATION DEFENSE

26. Campos next argues that the trial court erred when it failed to recognize that voluntary intoxication can serve as a defense to felony murder. For support, Campos points to the trial judge's findings of fact and conclusions of law in rendering judgment.

The trial judge noted that he had a reasonable doubt as to whether Campos knew his acts created a strong probability of death because of Campos's voluntary intoxication, but the judge concluded that, because intoxication is not a defense to second-degree murder, Campos was guilty of first-degree felony murder.

## A. The Trial Court's Findings

27. At the outset we note that we are confronted with a somewhat unusual situation with respect to these findings stemming from the fact that this case was tried as a bench trial rather than a jury trial. In a jury trial, the judge functions as a gatekeeper, filtering the evidence actually presented to the factfinder to ensure that the factfinder's conclusions are not based on improper considerations or evidence. *See, e.g., United States v. Talbott*, 78 F.3d 1183, 1188 (7th Cir.1996) (noting judge serves as gatekeeper for affirmative defenses defendant wishes to submit to the jury); *State v. O'Key*, 321 Or. 285, 899 P.2d 663, 677–78 (1995) (en banc) (discussing role of judge as gatekeeper in context of admission of scientific evidence). In a bench trial, however, the judge is put in the position of acting as both gatekeeper and factfinder. Consequently, during a bench trial the judge is often confronted with evidence and argument that he or she must subsequently disregard or ignore as factfinder when rendering a decision.

28. In this case, the trial judge unfortunately blurred his dual role as factfinder and gatekeeper in drafting his findings of fact and conclusions of law. He initially gave credence to the intoxication evidence and applied it to an evaluation of the mens rea for felony murder. He then determined in his role as gatekeeper that, under the law, such evidence should not be considered by the factfinder. He therefore concluded that the defendant was guilty of felony murder. Accordingly, the question presented on this appeal is not a factual dispute, but rather is whether the trial judge erred as a matter of law when he concluded that voluntary intoxication was not a defense to felony-murder.

## B. Felony–Murder Mens Rea

29. As noted above, we explained in *Ortega* that in order for the felony murder doctrine to apply to a defendant, the State must prove that the defendant acted with the mens rea for at least second-degree murder. *Ortega*, 112 N.M. at 563, 817 P.2d at 1205 ("[T]here must be proof that the defendant *intended* to kill (or was knowingly heedless that death might result from his conduct)."); *see also State v. Griffin*, 116 N.M. 689, 695, 866 P.2d 1156, 1162 (1993) ("The felony murder [mens rea] requirement is satisfied if there is proof that the defendant intended to kill, knew that his actions created a strong probability of death or great bodily harm to the victim or another person . . ., or acted in a manner greatly dangerous to the lives of others."). In other words, the mens rea necessary to support a conviction for another type of murder generally would also support a felony-murder conviction. *Griffin*, 116 N.M. at 695, 866 P.2d at 1162.

30. As a result of this mens-rea requirement, our felony-murder rule is best described as elevating the crime of second-degree murder to first-degree murder when the murder is committed during the course of a dangerous felony. *Ortega*, 112 N.M. at 563, 817 P.2d at 1205. Therefore, Campos's contention that intoxication is a defense to felony murder is in essence a contention that intoxication is a defense to second-degree murder. We reject this contention.

## C. Second–Degree Murder and Intoxication

31. This Court has consistently held that intoxication is not a defense to second-degree murder. *See State v. Tapia*, 81 N.M. 274, 275–76, 466 P.2d 551, 552–53 (1970) (citing earlier cases). The rationale for this conclusion has always been that voluntary intoxication is only a defense to specific-intent crimes, whereas second-degree murder is a general-intent crime. *Id.*

32. This intoxication doctrine originated under an earlier version of our murder stat-

ute which held that the applicable mens rea for murder was malice aforethought. *See* NMSA 1978, § 30-2-1 (Orig.Pamp.) ("Murder is the unlawful killing of one human being by another *with malice aforethought*, either express or implied, by any of the means with which death may be caused."). In 1980 the legislature amended the murder statute to its present form. 1980 N.M.Laws, ch. 21. However, even after the legislature changed the statutory mens rea of second-degree murder from malice aforethought to knowledge, this Court continued to hold that second-degree murder is a general-intent crime, *State v. Ortega*, 112 N.M. 554, 565 n. 9, 817 P.2d 1196, 1207 n. 9 (1991); *State v. Beach*, 102 N.M. 642, 644-45, 699 P.2d 115, 117-18 (1985),[4] and therefore that voluntary intoxication is not a defense, *cf. Beach*, 102 N.M. at 645, 699 P.2d at 118 (discussing inapplicability of diminished capacity defense). Campos now asks us to revisit these holdings.

## 1. Knowledge Mens Rea for Second-Degree Murder

33. Campos focuses on our statement in *Beach* that the mental state for second-degree murder is "specific knowledge." *Id.* Campos suggests that the mens rea of specific knowledge transforms second-degree murder into a specific-intent crime for which intoxication would be a defense. However, this is an incorrect statement of the law.

34. First, we note that the use of the term *"specific* knowledge" in *Beach* was both unfortunate and unnecessarily confusing due to its similarity with the term "specific intent," which is a legal term of art. The confusion initially arose in *State v. Doe*, 100 N.M. 481, 484, 672 P.2d 654, 657 (1983), when this Court explained why the trial court did not have to give an instruction on general criminal intent in that case. The *Doe* Court explained that before the 1980 amendment of the murder statute, the necessary mental

state for second-degree murder was simply the general criminal intent required for all crimes lacking a legislatively established mens rea. However, after amendment, the legislature specified the necessary intent for second-degree murder as knowledge. *Id.* Therefore the general criminal intent instruction was unnecessary because a particular mental state for second-degree murder was now specified and was one which the jury could evaluate without additional instruction. Unfortunately, instead of stating that the legislature established a "specified mental state" for second-degree murder, the *Doe* Court noted that the legislature set out the "specific intent" for second-degree murder. *Id.* This language led some to suggest that second-degree murder was now a specific-intent crime.

35. This Court in *Beach* attempted to clear up the confusion by stating that "[t]he better wording in *Doe* would have been 'specific knowledge' rather than 'specific intent.'" *Beach*, 102 N.M. at 645, 699 P.2d at 118. However, this explanation only added to the problem by retaining the term "specific" in conjunction with "knowledge." The proper clarification should have been to state that *Doe* actually meant to say "specified mens rea." However, by applying the nondescriptive term "specific" to the mens rea of "knowledge" the *Beach* Court created an unintended linguistic link between the mens rea of knowledge and the legal concept of specific-intent crimes.

36. Unfortunately, this Court stumbled into the same linguistic pitfall in *Ortega*, 112 N.M. at 565, 817 P.2d at 1207, in noting that "the 'specific intent' set forth in the [murder] statute is an element of the crime [of felony murder]." We attempted to clarify in a footnote that, in so stating, we were not suggesting that felony murder was a specific-intent crime. *Id.* at 565 n. 9, 817 P.2d at 1207 n. 9. However, once again, the better wording would have been that the "specified mens rea" set forth in the murder statute is an

---

**4.** To the extent that a single sentence of unsupported dicta in a footnote in *State v. Abeyta*, 120 N.M. 233, 242 n. 5, 901 P.2d 164, 173 n. 5

(1995), suggests otherwise, it is expressly abrogated.

element of the crime of felony murder. Accordingly, to avoid any further confusion, this opinion will refer to the mens rea of second-degree murder simply as knowledge.

### 2. General Intent v. Specific Intent

▮ 37. Having clarified the proper mens rea for second-degree murder, we now turn to Campos's contention that second-degree murder nevertheless should be analyzed as a specific-intent crime. We explained in *Beach* that the class of specific-intent crimes encompasses those crimes for which the statutory elements include an intent to do some further act or achieve some additional consequence. *Beach*, 102 N.M. at 644, 699 P.2d at 117; *see also People v. Hood*, 1 Cal.3d 444, 82 Cal.Rptr. 618, 462 P.2d 370, 378 (1969) ("When the definition [of a crime] refers to defendant's intent to do some further act or achieve additional consequence, the crime is deemed to be one of specific intent."). The remaining crimes that lack this element of further intent comprise the class of general-intent crimes. Thus, a general-intent crime is one for which no additional intent to accomplish a further goal is specified.

▮ 38. A crime defined as requiring the mens rea of knowledge, such as second-degree murder, does not require any further intent and therefore does not fall within the class of specific-intent crimes. As the *Beach* Court properly noted, "Second-degree murder ... by statutory definition, [does] not contain an element of intent to do a further act or achieve a further consequence." *Id.* at 645. Accordingly, as a "knowledge" crime, second-degree murder is a general-intent crime. The U.S. Supreme Court expressed agreement with this view of knowledge crimes in *Sandstrom v. Montana*, noting that "[t]he element of intent in the

criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more *general one of knowledge* or awareness." *Sandstrom v. Montana*, 442 U.S. 510, 525–26, 99 S.Ct. 2450, 2460, 61 L.Ed.2d 39 (1979) (emphasis added) (alteration in original) (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 445, 98 S.Ct. 2864, 2877, 57 L.Ed.2d 854 (1978)); *see also People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840, 843 (1979) ("Second-degree murder, because it contains the mens rea element 'knowingly,' is a general intent crime.").[5]

▮ 39. In *Garcia* this Court further clarified the approach we took in *Beach*. We considered in *Garcia* the differences between premeditated first-degree murder and second-degree murder. *Garcia*, 114 N.M. at 272–73, 837 P.2d at 865–66. We noted, "Even though an intentional killing includes the element of knowledge of a strong probability of death or great bodily harm, the converse is not necessarily true; a killing with knowledge of the requisite probability does not necessarily include an intentional killing." *Id.* Indeed, we pointed out that it is precisely the deliberate intention to cause death that distinguishes premeditated first-degree murder from second-degree murder. *Id.* at 273, 837 P.2d at 866. It is this deliberate intent to cause death, beyond the defendant's intentional actions, that makes premeditated first-degree murder a specific-intent crime. Similarly, the lack of any additional intent element renders second-degree murder a general-intent crime for which intoxication is not a defense.

40. Furthermore, although *Garcia* holds that an intentional killing (which lacks premeditation or deliberation) can also be classified as second-degree murder, *id.*, this hold-

---

5. It is important not to confuse the phrase "general-intent crime" with that of "general criminal intent," which is a distinct concept. *See* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.5, at 313–16 (1986) (noting different meanings of "general intent"); SCRA 1986, 14–141 (UJI for general criminal intent and Use Note). General criminal intent is the term used to define the mens rea for a crime that has no stated mens rea. This mens rea is defined as conscious wrongdoing or the purposeful doing of an act that the law declares to be a crime. The class of general-intent crimes on the other hand is best defined as the those crimes which are not specific-intent crimes, which would include both crimes with a mens rea of general criminal intent and those with a mens rea of knowledge.

ing does not justify an intoxication defense. Intoxication would only serve as a defense to the specific-intent aspect of the crime, namely the intentional nature of the killing, but would still leave the defendant guilty of a knowing killing, which is also second-degree murder. *Cf. id.* at 271, 837 P.2d at 864 (noting that neurological impairment only negates specific intent and therefore is irrelevant to the charge of second-degree murder (citing *Beach* )).

*3. Legislative Intent*

41. We find additional support for our holding that second-degree murder is a general-intent crime for which intoxication is not a defense by looking to the legislative intent behind the amendment of the murder statute. We note that, when the legislature amended the murder statute, it did so against the background of our previous murder cases as well as our uniform jury instructions in existence at the time. *Garcia,* 114 N.M. at 273, 837 P.2d at 866.

42. In *Ortega* we specifically examined the legislative amendment of Section 30–2–1. *Ortega,* 112 N.M. at 564–65, 817 P.2d at 1206–07. We explained that the term "malice aforethought," as used in our previous murder statute, "ha[d] become a mere symbol for denoting various mental states." *Id.* at 565, 817 P.2d at 1207. We found that "[a]mong the mental states so denoted [by this term] ... [is] intent to do an act knowing that it will probably cause death or great bodily harm...." *Id.* We therefore concluded that the legislature, in amending the murder statute, simply replaced the more archaic term "malice aforethought" with equivalent yet more descriptive terms for the mental states for first- and second-degree murder. *Id.* ("We thus conclude that the

"malice" required for murder ... is an intent to kill or an intent to do an act greatly dangerous to the lives of others or *with knowledge that the act creates a strong probability of death or great bodily harm."* (Emphasis added)).

43. Accordingly, it is apparent that, by amending Section 30–2–1, the legislature merely intended to modernize the terminology in the statute by replacing the term malice aforethought with clearer language that was already implicit within the meaning of malice aforethought. The legislature did not intend to dramatically alter the mens rea for second-degree murder. Thus it is logical to conclude that, in taking this step, the legislature did not intend to depart from or legislatively overrule the long line of case law that defined second-degree murder as a general-intent crime and that held intoxication is not a defense to second-degree murder.[6]

44. Strong public policy concerns bolster our conclusion that the legislature did not intend to allow intoxication to serve as a defense to second-degree murder. The prevalence of crimes involving intoxication is a particularly grave problem in New Mexico, and is of paramount concern to the legislature. *Cf. Buffett v. Vargas,* 121 N.M. 507, 508, 509 n. 1, 914 P.2d 1004, 1005, 1006 n. 1 (1996) (discussing New Mexico's serious problem with drunk drivers); *State ex. rel. Schwartz v. Kennedy,* 120 N.M. 619, 624, 904 P.2d 1044, 1049 (1995) (noting problem of high rate of DWI-related fatalities). *See generally People v. DelGuidice,* 199 Colo. 41, 606 P.2d 840, 844 (1979) (citing public policy as justification for not allowing intoxication as a defense to knowledge).

*4. Other Jurisdictions*

45. Finally, a review of other jurisdictions reveals that a majority of states (for differing

---

6. Conversely, reading the statute as allowing for an intoxication defense to second-degree murder could lead to surprising and unintended results. Although we are not confronted with this issue today, it is quite conceivable that a defendant who argues successfully that intoxication negated the knowledge mens rea for second-degree murder could not be convicted of any degree of homicide—under either the murder or man-

slaughter statutes—for the killing. *See* § 30–2–1 (murder); § 30–2–3 (manslaughter); *Smith v. State,* 89 N.M. 770, 773–74, 558 P.2d 39, 42–43 (1976) (noting that voluntary manslaughter generally is not a catchall category for homicides that are not murder). This possibility most certainly was not intended by the legislature when it amended the murder statute.

reasons) do not allow intoxication as a defense to second-degree murder, including many states that do allow intoxication to negate the mens rea of knowledge. Roughly half of the states still follow the common-law approach of barring an intoxication defense for general-intent crimes, including second-degree murder. *See, e.g., Shell v. State,* 307 Md. 46, 512 A.2d 358, 364–67 (1986) (noting alternate approaches and concluding that it is best to retain bar on intoxication defense for general-intent crimes despite flaws); Annotation, *Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge,* 8 A.L.R.3d 1236 (1966 & Supp.1995) (listing states); Robinson, *supra,* § 65(a) n. 11 (same). *But see State v. Egelhoff,* 272 Mont. 114, 900 P.2d 260, 266 (holding a statute that prevented consideration of intoxication for evaluation of knowledge mens rea to be unconstitutional violation of due process), *cert. granted, Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 593, 133 L.Ed.2d 514 (1995).[7]

■ 46. Of the states that have moved away from the traditional approach to general- and specific-intent crimes, several have statutorily barred the use of intoxication as a defense to knowledge crimes such as second-degree murder. *See, e.g.,* Idaho Code § 18–116 (1979); Nev.Rev.Stat. § 193.220 (1981); S.D.Codified Laws Ann. § 22–5–5 (1979). As for those states that do allow intoxication to negate knowledge, many still hold that the defense is inapplicable to second-degree murder because, under their statutes, second-degree murder also includes the lesser mens rea element of recklessness. *See Weaver v. State,* 591 So.2d 535, 546 (Ala.Crim.App.) (concluding that intoxication is no defense to depraved-heart murder based on reckless state of mind), *cert. denied* (Dec. 6, 1991); *State v. Dufield,* 131 N.H. 35, 549 A.2d 1205, 1208 (1988) (same); Model Penal Code §§ 2.08(2), 210.2(1)(b) (1985) (noting that recklessness is one mens rea for criminal

homicide and that intoxication is no defense to reckless mens rea). Thus a clear majority of jurisdictions do not allow intoxication to defeat a charge of second-degree murder. Consequently, we hold that the trial court did not err when it concluded that intoxication is not a defense to second-degree murder, and therefore is also not a defense to first-degree felony murder.

## IV. BACA'S REFUSAL TO TESTIFY

■ 47. Campos next contends that he was denied his constitutional right to confront a witness against him. His assertion is based on the fact that, during the trial, Bernie Baca refused to answer several questions posed by Campos. Baca even maintained his silence under threat of contempt by the court. Rather than force the court to find Baca in contempt, Campos voluntarily abandoned his cross-examination of Baca and agreed to allow the judge as factfinder to read Baca's prior statements. Campos therefore acquiesced in the admission of Baca's prior statements despite his continued refusals to testify on the stand. Acquiescence in the admission of evidence, however, constitutes waiver of the issue on appeal. *State v. Attaway,* 114 N.M. 83, 87, 835 P.2d 81, 85 (Ct.App.1992), *aff'd,* 117 N.M. 141, 870 P.2d 103 (1994). Campos contends that we should still review his claim under the fundamental error doctrine because he asserts a fundamental right is at stake. However, Campos's voluntary abandonment of cross examination and his agreement to the admission of the prior statements invited the error which Campos now alleges was fundamental. The doctrine of fundamental error cannot be invoked to remedy the defendant's own invited mistakes. *State v. Bankert,* 117 N.M. 614, 622, 875 P.2d 370, 376 (1994). Accordingly, this argument is without merit.

## V. DOUBLE JEOPARDY

■ 48. Campos's final argument is that his conviction and sentencing for both felony

---

7. We acknowledge that the U.S. Supreme Court is currently reviewing whether a defendant has a due process right to consideration of intoxication evidence as a defense to a crime with the mens rea of knowledge. Subsequent to the filing of this opinion, but after the filing of a motion for rehearing, the U.S. Supreme Court issued its opinion in *Montana v. Engelhoff,* —— U.S. ——, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); however, the opinion of this Court remains unchanged.

murder and the underlying felony violates the constitutional protections against double jeopardy. The State admits this point on appeal. The State agrees with Campos that the conduct underlying the CSP and the murder was unitary, *Swafford,* 112 N.M. at 14–15, 810 P.2d at 1234–35, and that the legislature did not intend to punish Campos twice for the same killing, *id.* at 15, 810 P.2d at 1235. The State therefore concedes that the "case should be remanded for resentencing with instructions to vacate Defendant's CSP conviction." Given this concession, we need not analyze further Campos's double-jeopardy arguments. *See generally State v. Contreras,* 120 N.M. 486, 491–92, 903 P.2d 228, 233–34 (1995) (applying double-jeopardy analysis). We therefore reverse Campos's conviction and sentence for first-degree CSP.

## VI. CONCLUSION

49. For the forgoing reasons, we affirm Campos's conviction for first-degree felony murder, reverse his conviction for first-degree criminal sexual penetration, and remand for resentencing in conformity with this opinion.

50. **IT IS SO ORDERED.**

RANSOM, BACA and MINZNER, JJ., concur.

FRANCHINI, J. (dissenting).

FRANCHINI, Justice (dissenting).

51. I respectfully dissent. This was not a jury trial. The trial court, in its role as the factfinder, specifically stated that it had a reasonable doubt that Campos intended to kill Gutierrez and that it also had a reasonable doubt that, at the time the acts were committed, Campos knew that his acts created a strong probability of death or great bodily harm. *See* NMSA 1978, § 30–2–1(B) (setting forth elements of felony murder and second-degree murder). The State did not challenge the trial court's finding of reasonable doubt, and that finding is binding on this Court. *See* SCRA 1986, 12–213(A)(3) (Repl.

Pamp.1992); *Castle v. McKnight,* 116 N.M. 595, 597, 866 P.2d 323, 325 (1993). The trial court's finding of reasonable doubt cannot be ignored, nor can this finding be reconciled with the rule in *State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991). Under *Ortega,* a defendant may not be convicted of felony murder absent a finding that the defendant either "intended to kill[ ] or was knowingly heedless that death might result from his conduct[ ]." *Id.* at 563, 817 P.2d at 1205. Despite the trial court's reasonable doubt and the *Ortega* rule, the trial court concluded that because its doubt was based upon the voluntary intoxication of the Defendant it could not be considered for either felony murder or second-degree murder. Therefore, the trial court felt compelled to convict Campos of felony murder. Contrary to the majority's view, it is my opinion that the unchallenged finding of reasonable doubt by the trial court supported the conclusion that Campos was not guilty of either felony murder or second-degree murder. I am also of the opinion, contrary to the majority, that the court's conclusion that our case law prevented him from considering the voluntary intoxication of the defendant was error as a matter of law.

52. *First and second-degree murder have elements of subjective malice.* When death results from intentionally-inflicted harm, the resultant crime is either murder or voluntary manslaughter. *See State v. Aragon,* 85 N.M. 401, 402, 512 P.2d 974, 976 (Ct.App.1973) (holding that one set of facts may support either first- or second-degree murder or voluntary manslaughter). The killing is murder if the state proves that the defendant not only intended to do the act that killed the victim but also had a state of mind indicating malice. *See* § 30–2–1; *Ortega,* 112 N.M. at 562, 817 P.2d at 1204 (denoting four mental states that support conviction for first- or second-degree murder and holding that to prove felony-murder, state must show that defendant had malice of one of those mental states); *State v. Ibn Omar–Muhammad,* 102 N.M. 274, 277, 694 P.2d 922, 925 (1985) (holding that state must prove defendant had

subjective knowledge of facts to establish malice necessary for depraved-mind murder); *Torres v. State*, 39 N.M. 191, 194, 43 P.2d 929, 931 (1935) (stating that if state proves killing with only ordinary malice, it is second-degree murder, but if state proves intensified malice, defendant may be convicted of first-degree murder).

53. Before 1980, murder was broadly defined as an unlawful killing with malice aforethought, *see State v. Smith*, 89 N.M. 777, 779, 558 P.2d 46, 48 (Ct.App.1976), and malice to satisfy second-degree murder could be implied if there was no evidence of "considerable provocation," *see State v. Padilla*, 66 N.M. 289, 293, 347 P.2d 312, 314 (1959). No other proof of a specific state of mind was required for conviction of second-degree murder. However, in 1980 the legislature amended the murder statutes. I do not agree with the majority's characterization of the legislature's intent underlying this modification as "merely" modernizing the terminology in the statutes. By amending Section 30–2–1(B), the legislature defined malice more narrowly, introducing a new "knowledge" element. Now, for second-degree murder the state must prove beyond a reasonable doubt that a defendant *at least* knew that his act created a strong probability of death or great bodily harm. Section 30–2–1(B); *see also State v. Beach*, 102 N.M. 642, 644, 699 P.2d 115, 117 (1985) (explaining that second-degree murder "now contains an element of subjective knowledge."); *Commonwealth v. Sama*, 411 Mass. 293, 582 N.E.2d 498, 501 (1991) (holding that in second-degree murder prosecutions subjective, not objective, knowledge must be shown). This is precisely the issue on which the trial court had a reasonable doubt.

54. *Intoxication is a circumstance that should be considered when determining the subjective state of mind of a defendant charged with murder.* " '[I]ntoxication' means a disturbance of mental or physical capacities resulting from the introduction of substances into the body." Model Penal Code § 2.08(5)(a) (1985). "Like mistake and mental illness, a state of intoxication may also negate a required offense element, and when raised in this context is a failure of proof defense." 1 Paul H. Robinson, *Criminal Law Defenses* § 22, at 75 (1984). The common-law rule followed in New Mexico is that "an act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind." *Black's Law Dictionary* 822 (6th ed. 1990); *State v. Tapia*, 81 N.M. 274, 275, 466 P.2d 551, 552 (1970) (stating the principle but holding that because no specific intent statutorily required for second-degree murder, intoxication not a defense to such a charge); *State v. Cooley*, 19 N.M. 91, 101, 140 P. 1111, 1114 (1914) (holding intoxication not a consideration for second-degree murder because malice could be implied from commission of a killing without provocation).

55. *Second-degree murder is not a "specific-intent" or "general-intent" crime, but requires proof of specific knowledge.* In *Ortega*, we explained that the state of mind necessary for second-degree murder is "specific knowledge," but we stated that we did not mean to imply that felony murder is a "specific-intent crime." 112 N.M. at 565 n. 9, 817 P.2d at 1207 n. 9. I do not believe, however, that *Ortega* meant to imply that felony murder is only a "general-intent crime."

56. A "general-intent" crime, in its broadest sense, is one in which a particular criminal intent is not specified in the statute. When a statute is silent regarding a criminal intent element, we presume general criminal intent as an essential element of the crime unless it is clear that the legislature intended to omit that element. *Santillanes v. State*, 115 N.M. 215, 218, 849 P.2d 358, 361 (1993). General criminal intent is defined as "conscious wrongdoing," or "the purposeful doing of an act that the law declares to be a crime." *Omar–Muhammad*, 102 N.M. at 278, 694 P.2d at 926. New Mexico has long held that evidence of voluntary intoxication is not admissible for general-intent crimes.

57. When the legislature defines a crime (like manslaughter, for example) only in terms of a prohibited act and its commission does not rely on a particular state of mind, the state of mind of the defendant in regard to the *result* is irrelevant—we are only concerned that the defendant had a general criminal intent in regard to the *unlawful act* that produced the result. *See State v. Bitting*, 162 Conn. 1, 291 A.2d 240, 242 (1971) ("When the elements of a crime consist of a description of a particular act and a mental element not specific in nature the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability."); *State v. Kirkaldie*, 179 Mont. 283, 587 P.2d 1298, 1304 (1978) (stating that state of mind is at issue in charge of deliberate homicide requiring proof that defendant committed act knowing result, so intoxication is relevant, but intoxication is not relevant in a negligent homicide charge because a specific state of mind is not at issue under that charge); *cf. Martin v. State*, 56 Ala.App. 33, 318 So.2d 772, 774 (stating that intoxication is not a defense to voluntary manslaughter and affirming conviction in case in which there was no evidence of provocation but defendant was intoxicated when he pushed victim into water), *cert. denied*, 294 Ala. 765, 318 So.2d 775 (1975); *People v. Duffield*, 20 Mich.App. 473, 174 N.W.2d 137 (1969) (holding that intoxication isn't available in a "non-specific" intent crime like manslaughter), *aff'd*, 387 Mich. 300, 197 N.W.2d 25 (1972).

58. Intoxication may affect cognitive processes and prevent a person from coolly deliberating or knowing the consequences of his acts, but it usually has no effect on whether a person is purposefully doing something declared to be a crime. For example, there is no question that a drunk driver is purposefully driving his car; he just does not care that what he is doing is a crime. "As a general proposition, a defendant should not be relieved of responsibility when he was able to devise a plan, operate equipment, instruct the behavior of others, or carry out acts requiring physical skill." *Terry v. State*, 465 N.E.2d 1085, 1088 (Ind.1984).

59. *Intoxication may negate a specific subjective state of mind.* Part of the confusion in our common law regarding when it is proper to allow consideration of intoxication arises from distinguishing crimes based solely upon their "specific-intent" or "general-intent" status. As a term of art, a "specific-intent crime" is one for which a statute expressly requires proof of "intent to do a further act or achieve a further consequence." *State v. Bender*, 91 N.M. 670, 671, 579 P.2d 796, 797 (1978). Our courts have long followed a blanket rule that intoxication is a consideration only for first-degree murder and other "specific-intent crimes" without examining whether intoxication may also negate states of mind *besides* the intent to achieve a further act or consequence. I believe they did so because until 1980 our homicide statutes contained no other express state of mind requirements.

60. I agree with professors LaFave and Scott that

> it may be said that it is better, when considering the effect of the defendant's voluntary intoxication upon his criminal liability, to stay away from those misleading concepts of general intent and specific intent. Instead, one should ask, first, what intent (or knowledge) if any does the crime in question require; and then, if the crime requires some intent (knowledge), did the defendant in fact entertain such an intent (or did he in fact know what the crime requires him to know).

1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 4.10(a), at 554 (1986) (footnotes deleted); *see also State v. Lunn*, 88 N.M. 64, 73–74, 537 P.2d 672, 681–82 (Ct.App.) (Sutin, J., dissenting) (urging the Supreme Court to adopt a rule allowing a jury to weigh the effect of intoxication on a defendant's mental capacity to determine whether he was able to form the malice necessary for conviction of second-degree murder despite the fact that it is not a specific-intent crime), *cert. denied*, 88 N.M. 318, 540 P.2d 248 (1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976); Note, *Intoxication as a Criminal*

*Defense,* 55 Colum.L.Rev. 1210, 1216 (1955) (stating that if "implied malice requires the defendant to have consciously created a great risk of death to be guilty of murder, proof of intoxication making the defendant unaware of the risk should be admissible to negate malice and thus reduce the crime to manslaughter").

61. The capacity to possess a specific state of mind may be just as affected by intoxication as the capacity to intend to do a further act. To support conviction for first-degree murder, for example, the state must prove that the defendant had a specific state of mind in which he "coolly deliberated" before he carried out his intentions. This particular state of mind is not what makes first-degree murder a "specific-intent crime"—and yet *it is this specific state of mind that proof of intoxication may also negate. See State v. Padilla,* 66 N.M. 289, 293, 347 P.2d 312, 314 (1959) (approving instruction that evidence of intoxication, even if voluntary, may be used in determining whether "the mind of the defendant was incapable of that cool and deliberate premeditation necessary to constitute murder in the first degree").

62. Just as the state of mind of "cool deliberation" does not make first-degree murder a "specific-intent crime," "knowing" does not make second-degree murder a "specific-intent crime." Nevertheless, "knowing" is a specific state of mind that may be affected by external influences such as extreme intoxication or internal mental deficiencies that do not rise to the level of insanity. We have long recognized this principle because we have always held that *involuntary* intoxication may be a defense to either first- or second-degree murder. *See* SCRA 1986, 14–5106. The only rationale for allowing involuntary intoxication as a defense at all is because intoxication in fact may negate the malice for murder. *Cf. State v. Privett,* 104 N.M. 79, 82, 717 P.2d 55, 58 (1986) (stating that in a charge of murder a jury must consider the effect of intoxication upon a defendant's "state of mind").

63. Citing to *Beach,* the majority opinion notes that this Court has consistently refused to allow consideration of voluntary intoxication or diminished capacity in second-degree murder, and should continue to do so. In *Beach,* however, this Court refused to allow a diminished capacity instruction for second-degree murder because of its blanket conclusion that second-degree murder is not a "specific-intent crime" and because the Court felt bound by the existing criminal uniform jury instructions limiting diminished capacity defenses to willful and deliberate murder and other specific-intent crimes. 102 N.M. at 644, 699 P.2d at 117. Jury instructions, however, are controlled by and are a reflection of statutory and common law; they are not binding precedent upon this Court. *See State v. Wilson,* 116 N.M. 793, 795, 867 P.2d 1175, 1177 (1994) ("The Supreme Court will amend, modify, or abolish uniform jury instructions when such instructions are erroneous.").

64. Moreover, the *Beach* Court did not consider whether voluntary intoxication may affect subjective specific knowledge to the degree that a defendant may not know the likely consequences of his act. Further, the Court improperly lumped manslaughter with second-degree murder in considering whether intoxication is relevant to the elements required for conviction for those crimes, erroneously stating that *both* crimes had a knowledge element. *See* 102 N.M. at 645, 699 P.2d at 118. I disagree with *Beach* to the extent that it holds that voluntary intoxication and diminished capacity are not factors that may be considered in determining whether the state has met its burden of showing the defendant had knowledge of the likely consequences of his acts beyond a reasonable doubt. Moreover, I agree with the principles this Court stated in *Padilla,* 66 N.M. at 293–94, 347 P.2d at 315–16, in which we explained that mental deficiencies less than insanity may affect the condition of the mind and its abilities. Extreme intoxication, even if voluntary, may affect the ability to reason and appreciate consequences as fully as it may affect the ability to deliberate.

65. I am compelled by the principle that where the existence of a specific intent or

state of mind is a necessary element of a crime, the jury in determining the intent or state of mind with which a defendant acted may take into consideration factors that may affect that state of mind. Defendants charged with second-degree murder may present evidence of extreme intoxication to rebut an inference of subjective knowledge. There is support for this conclusion from the holdings of our sister states. *See, e.g., Helms v. State,* 254 Ala. 14, 47 So.2d 276, 280 (1950); *State v. Watkins,* 126 Ariz. 293, 614 P.2d 835, 843 (1980) (In Banc) (stating that when second-degree murder statute includes mental states of "intentionally," "knowingly," or "recklessly," intoxication may affect intentional or knowing conduct, but not reckless conduct); *People v. Foster,* 19 Cal.App.3d 649, 97 Cal.Rptr. 94, 98 (1971) (stating that although knowledge is not identical with intent, it is mental state to which intoxication has obvious relevance, and if knowledge is a requisite element of a crime, court must instruct on intoxication if there is sufficient evidence); *People v. Gross,* 52 Ill.App.3d 765, 10 Ill.Dec. 419, 423, 367 N.E.2d 1028, 1032 (1977); *People v. Hicks,* 35 Ill.2d 390, 220 N.E.2d 461 (1966), *cert. denied,* 386 U.S. 986, 87 S.Ct. 1295, 18 L.Ed.2d 236 (1967); *Commonwealth v. Sama,* 411 Mass. 293, 582 N.E.2d 498, 501 (1991) (stating that "[e]vidence of intoxication certainly bears on the defendant's ability to possess the requisite knowledge of the circumstances in which he acted"); *State v. Warren,* 104 N.J. 571, 518 A.2d 218, 220 (1986) (explaining that when the legislature modified its murder statutes it replaced "specific-intent" crimes with "purposely" and "knowingly" and replaced "general-intent" crimes with "recklessness" and "criminal negligence"); *People v. Davis,* 18 A.D.2d 644, 235 N.Y.S.2d 282, 283 (1962), *aff'd,* 13 N.Y.2d 1151, 247 N.Y.S.2d 140, 196 N.E.2d 569 (1964).

66. Though the majority opinion cites to a "clear majority" position on voluntary intoxication, that question of law is far from settled. The United States Supreme Court is currently reviewing a constitutional challenge to the exclusion of evidence of voluntary intoxication as it relates to the formation of the "knowledge" mens rea of the offense. *See State v. Egelhoff,* 272 Mont. 114, 900 P.2d 260 (1993), *cert. granted, Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 593, 133 L.Ed.2d 514 (1995) In *Egelhoff,* the Montana Supreme Court held that the instruction that prevented the jury from considering defendant's voluntary intoxication to determine whether he had requisite mental state to "knowingly" cause the death of another relieved the State of part of its burden to prove beyond a reasonable doubt every element of the offense charged and thus denied defendant his right to due process. 900 P.2d at 266. The *Egelhoff* court was concerned with the defendant's lack of opportunity to present rebuttal evidence that the intoxication had precluded him from forming the requisite mental state. As a result, the Montana Court concluded that the prosecution's burden of proof for the element of the mental state was reduced. *Id.* at 265.

67. In this case, the evidence of intoxication was presented to the factfinder and he had a reasonable doubt as to whether Campos was able to form the requisite mental state of "knowledge," i.e. "that Campos intended to kill Gutierrez or knew his acts created a strong probability of death or great bodily harm." The trial court's subsequent conclusion that in spite of his reasonable doubt he would not consider the Defendant's voluntary intoxication and therefore find him guilty of felony murder was error. In my opinion, it is immaterial whether the lack of specific intent or subjective knowledge is the result of mental illness, involuntary or voluntary intoxication, or another disability preventing the defendant from having the requisite state of mind required for the commission of the crime charged. In my opinion, there is no legitimate difference in effect between voluntary or involuntary intoxication on the required mental state of the defendant. If the subjective knowledge required of the defendant by the offense charged is vitiated by the intoxication or, as in this case, created a reasonable doubt in the mind of the factfinder, that evidence is

always relevant and should be considered. The effect of intoxication on the culpable knowledge of the defendant is *the legally significant factor,* not whether the intoxication is voluntary or involuntary.

68. Contrary to the majority view, it is my opinion that evidence of intoxication, voluntary or involuntary, must be considered by the factfinder to reduce any type of first-degree murder to second-degree murder or voluntary manslaughter, or second-degree murder to voluntary manslaughter. It cannot be used, however, to reduce murder or voluntary manslaughter to involuntary manslaughter or for that matter to completely excuse a defendant from the consequences of his unlawful act.

69. For the above-stated reasons, I respectfully dissent.